# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Colyar*, 2013 IL 111835

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MICHAEL COLYAR, Appellee. |
| | |
| Docket No. | 111835 |
| | |
| Filed | April 18, 2013 |
| Rehearing denied | October 3, 2013 |
| | |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Police who initiated a valid *Terry* stop and saw a large bullet in plain view in the car were justified, out of concern for their own safety, in ordering defendant out and searching his person and the vehicle; and there was no requirement of probable cause or an inquiry into whether defendant had a FOID card—suppression reversed. |
| | |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Douglas J. Simpson, Judge, presiding. |
| | |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment reversed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Veronica Calderon Malavia and Anne L. Magats, Assistant State's Attorneys, of counsel), for the People. |
| --- | --- |
| | Algis F. Baliunas, of Mokena, for appellee. |
| Justices | CHIEF JUSTICE KILBRIDE delivered the judgment of the court, with opinion. |
| | Justices Garman, Karmeier, and Theis concurred in the judgment and opinion. |
| | Justice Thomas specially concurred, with opinion. |
| | Justice Burke dissented, with opinion, joined by Justice Freeman, and dissented upon denial of rehearing, with opinion. |

**OPINION**

¶ 1    The issue in this appeal is whether police officers violated defendant's constitutional right to be free from unreasonable searches and seizures (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). The contested conduct arose during an incident that both parties agree was initiated as a proper *Terry* stop. After police officers observed a bullet in plain view in the center console of the vehicle, the officers ordered defendant and his two passengers out of the vehicle, handcuffed and searched them, and then, after recovering additional bullets from defendant's person and the vehicle, recovered a handgun from the passenger side floor of the vehicle.

¶ 2    The circuit court of Cook County granted defendant's motion to suppress all of the recovered evidence. A majority of the appellate court affirmed, concluding that the challenged police conduct subjected defendant to an unlawful search without probable cause because the bullet did not establish evidence of a crime. 407 Ill. App. 3d 294, 310. For the reasons that follow, we reverse the judgments of the appellate and circuit courts.

¶ 3                I. BACKGROUND

¶ 4    Defendant was charged with multiple weapons charges after police officers recovered bullets and a handgun from his person and vehicle. Defendant filed a pretrial motion to quash arrest and suppress evidence, arguing that the underlying search was unreasonable and that he was subjected to an unlawful arrest without probable cause.

¶ 5    At the suppression hearing, Homewood police officer William Alcott testified that on the

-2-

evening of June 29, 2006, he was working the tactical unit for a suburban task force in an unmarked squad car with his partner, Detective Johnson. The officers wore plain clothes, a police badge, a name tag, and a vest with the word "police" across the back.

¶ 6     At approximately 8:45 p.m., Officer Alcott arrived at a motel the officers routinely patrolled to check for "parties and stuff of that nature" involving minors. The officers, however, had not received any calls of suspicious activity or reports of criminal activity that day. When the officers arrived at the motel, defendant's vehicle was parked in the south entrance to the motel's parking lot, between 50 and 100 feet from the motel's main building entrance. Because of the location of defendant's vehicle, Officer Alcott drove around the motel building to the west parking lot entrance and stopped, observing defendant's vehicle for two or three minutes. During this time, defendant's vehicle remained in the entrance.

¶ 7     Officer Alcott parked his squad car in the parking lot, but he did not block defendant's vehicle. The officers then exited their squad car and walked toward defendant's vehicle to ask defendant why he was parked in the entrance. During their approach, the officers did not draw their service weapons. Officer Alcott described the lighting conditions at the time as "dusk" but "not dark." Defendant sat in the driver's seat, with the car's engine running, and there was also a passenger in his car. As the officers approached defendant's vehicle, a third individual exited the motel, walked to defendant's vehicle, and got inside the rear passenger compartment.

¶ 8     Officer Alcott approached the driver side, and Detective Johnson went to the passenger side. When Officer Alcott asked defendant why he was blocking the entrance, defendant replied that he was picking someone up from the motel. During this conversation, Detective Johnson motioned to Officer Alcott and advised him of a plastic bag in the center console. Officer Alcott shined his flashlight into the center console and saw in plain view a plastic bag with a bullet "sticking up" inside. Officer Alcott described the bullet as "the largest pistol round" he had ever seen, approximately three inches long. Officer Alcott further described the bullet as being as large as a rifle round.

¶ 9     After Officer Alcott saw the bullet, he ordered defendant and his two passengers out of the car. The officers handcuffed defendant and the two passengers near the front of the vehicle. Officer Alcott recovered the plastic bag from the center console, and discovered that it contained a total of five live rounds of .454-caliber ammunition.

¶ 10    After recovering the five bullets from the bag in defendant's center console, the officers conducted a pat-down search of defendant and his two occupants. Officer Alcott recovered a single bullet from defendant's front pants pocket that matched the five .454-caliber bullets recovered from the plastic bag in the center console. Based on the recovery of the five bullets from the center console and one bullet from defendant's pocket, Officer Alcott believed that there might be a gun inside defendant's vehicle. Ultimately, Detective Johnson found a .454 revolver under a floor mat on the front passenger side. Subsequently, defendant and his two passengers were transported to the police station.

¶ 11    Following Officer Alcott's testimony, and prior to ruling on defendant's motion to suppress, the circuit court heard arguments from the parties on two separate days. Defendant argued that the police officers lacked probable cause for any of their conduct because

possession of a bullet is not *per se* illegal and the police officers failed to ask defendant whether he possessed a valid Firearm Owner's Identification (FOID) card. Consequently, because the officers did not know whether defendant possessed the bullet legally, defendant asserted that the officers subjected him to an unlawful arrest without probable cause when they ordered him out of the car and handcuffed him. Defendant noted that no criminal activity had been reported in the area at the time of the incident and no evidence suggested that he was engaged in criminal activity.

¶ 12 In response, the State argued that the officers did not subject defendant to an illegal seizure or arrest. Instead, the officers acted appropriately when they approached defendant's vehicle to ascertain why it was blocking the motel's parking lot entrance. When the officers saw the bullet in the center console, they were entitled to order defendant and his two passengers out of the car for their own safety. Similarly, when they recovered the multiple bullets from the center console and the bullet from defendant's pants pocket, the officers properly searched the car and recovered the handgun.

¶ 13 After hearing arguments, the trial court denied defendant's motion to suppress the bullets, but granted his motion to suppress the gun. The court found that, pursuant to *Terry*, the officers properly recovered the bullets, including the bullet recovered from defendant's pants when he was handcuffed. The court further found, however, that the recovery of the gun was illegal because the officers did not have probable cause to believe that defendant was committing a crime when the possession of a bullet is not *per se* illegal and the officers failed to asked defendant if he possessed a valid FOID card. The court explained that it "presum[ed] the State's theory is search incident to arrest that allowed them to conduct" the search of the vehicle.

¶ 14 Defendant moved orally to reconsider the trial court's ruling admitting the bullets. Defendant again asserted that possession of a bullet is not *per se* illegal and, therefore, the officers in this case arrested him unlawfully when they ordered him out of the car and handcuffed him based solely on the plain-view bullet without first finding out if defendant possessed a valid FOID card or had previously been convicted of a felony. The State responded that the trial court's ruling admitting the bullets recovered from the center console and defendant's person was proper under *Terry*.

¶ 15 Following arguments on defendant's oral motion to reconsider, the circuit court granted his motion to reconsider and ordered that all the bullets be suppressed because the officers failed to ask defendant whether he possessed a valid FOID card before they ordered him out of the car and searched him and the vehicle. Thus, the court ordered that all of the recovered evidence, the bullets and the gun, be suppressed.

¶ 16 In addition, the circuit court continued the State's written motion to reconsider its ruling suppressing the gun. In pertinent part, the State argued that the officers' discovery of the bullets created justifiable concern for their safety because the bullets could reasonably indicate the presence of a gun, citing *Michigan v. Long*, 463 U.S. 1032 (1983). Ultimately, however, the State filed a certificate of substantial impairment and notice of appeal under Supreme Court Rule 604(a)(1) (eff. July 1, 2006) before the circuit court could rule on the State's motion to reconsider.

¶ 17    On appeal, a majority of the appellate court affirmed the circuit court's order suppressing all of the evidence. Before reaching the merits of the suppression order, the majority construed the State's position on appeal as being that the officers had probable cause to believe a crime had been committed when they saw the bullet in plain view in the center console of defendant's car, justifying a search incident to his arrest. Thus, the majority limited its analysis to whether the State had probable cause. 407 Ill. App. 3d at 297-300.

¶ 18    In a footnote, however, the majority acknowledged that the State's citation to *Long* in the motion to reconsider filed in the circuit court might indicate that the State intended to argue that the search was justified based on reasonable suspicion under *Terry*, rather than on probable cause. Nonetheless, the majority found that the State forfeited its *Terry* argument on reasonable suspicion when it filed a notice of appeal before the circuit court could rule on the State's motion to reconsider. The majority reasoned that a party is prohibited from advancing "a new theory" on appeal in an effort to overturn an adverse decision. 407 Ill. App. 3d at 297 n.3.

¶ 19    On the merits, the majority affirmed the suppression of all the bullets and the handgun based on a lack of probable cause. Specifically, the majority explained its conclusion that probable cause was lacking as follows:

> "While the officers engaged in a lawful *Terry* stop, the recovery of the bullets did not provide evidence of a crime in the absence of evidence that the defendant did not possess a valid FOID card or was a convicted felon. The officers improperly escalated the investigative stop into a full-blown arrest of the defendant and then engaged in the search of the vehicle as incident to the arrest." 407 Ill. App. 3d at 310.

¶ 20    The dissenting justice disagreed with the majority's decision to limit the State's position to probable cause for a search incident to arrest, noting that the State raised the *Terry*-stop rationale during the hearing on defendant's motion to suppress in the circuit court. Thus, the dissenting justice argued that the case should be reviewed as a brief investigative *Terry* stop.

¶ 21    Specifically, the dissenting justice believed the case was governed by the United States Supreme Court's holding in *Long*, permitting police officers to search the passenger compartment of a car when no arrest has been made if they reasonably believed that the suspect is dangerous and may gain immediate control of weapons. Relying on *Long*, the dissenting justice concluded that "the arresting officers, upon observing the plain-view bullet in the car, had reasonable suspicion to stop defendant and conduct protective searches for weapons on defendant's person and in the passenger compartment of his car. Then, the revolver found under the front-passenger floor mat gave the police probable cause to arrest defendant." Accordingly, the dissenting justice argued that the circuit court's suppression order should be reversed. 407 Ill. App. 3d at 311-15 (Lampkin, J., dissenting).

¶ 22    This court allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 23                                   II. ANALYSIS

¶ 24    On appeal, the State challenges the appellate court majority's affirmance of the circuit court's order suppressing the recovered bullets and handgun. This court reviews a trial

court's order suppressing evidence using a two-part standard. *People v. Oliver*, 236 Ill. 2d 448, 454 (2010). We afford great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence. *Oliver*, 236 Ill. 2d at 454. We review *de novo*, however, the trial court's ultimate legal ruling on whether suppression is warranted. *Oliver*, 236 Ill. 2d at 454.

¶ 25    As a preliminary matter, we address the appellate court majority's decision not to consider the State's argument that the police officers' conduct here constituted a lawful *Terry* stop based on reasonable suspicion. The majority believed the State was improperly attempting to assert a "new theory" on appeal, and limited its consideration solely to whether the officers' conduct was proper as a search incident to arrest. Essentially, the majority concluded that the State forfeited any argument based on *Terry*.

¶ 26    The State maintains that the majority erroneously concluded that it forfeited a *Terry* argument because, as the dissenting justice noted, the record demonstrates that the State argued *Terry*, including an argument that the searches were justified for officer safety, at the hearings on defendant's motion to suppress. Defendant does not respond to the State's forfeiture argument.

¶ 27    Generally, to preserve an issue for appellate review, a party must raise the issue before the trial court and in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Here, the record demonstrates that the State consistently argued in the pretrial suppression hearings before the circuit court that the officers' conduct was reasonable and proper under *Terry*. Notably, the circuit court itself found some of the officers' conduct proper under *Terry*. Moreover, in the State's posttrial motion to reconsider, the State relied on *Long*, a decision applying *Terry*, and argued that the officers' conduct was proper because they were concerned for their safety and reasonably suspected a gun was present after recovering the bullets. Based on this record, we necessarily reject the appellate court majority's conclusion that the State forfeited any argument based on *Terry*.

¶ 28    We now turn to the parties' substantive arguments on whether the officers' conduct here violated defendant's constitutional right to be free from unreasonable searches and seizures. The State argues that, under the totality of the facts and circumstances, what began as a neutral encounter escalated when the officers observed the bullet in plain view in the center console of defendant's vehicle. Reasonably suspecting that defendant or his passengers were armed and presently dangerous and that criminal activity may be afoot, the officers were permitted under *Terry* and *Long* to detain defendant and his passengers and perform protective searches of their persons and areas of the car that would provide immediate access to a weapon. Consequently, the State argues that the circuit court's suppression order should be reversed.

¶ 29    Defendant responds that *Terry* does not justify the officers' conduct because the circumstances were "absolutely benign" and possession of a bullet is not *per se* illegal. Thus, defendant argues that Officer Alcott and Detective Johnson could not reasonably believe a crime was being committed, particularly when they failed to ask him whether he possessed a valid FOID card. Defendant also notes that at the time of the incident it was dusk, but not yet dark, no suspicious or criminal activity had been reported in the area, and, besides the

police officers' vehicle, no other vehicle was inconvenienced by defendant's vehicle parked in the motel parking lot entrance.

¶ 30    Defendant does not challenge the officers' initial approach and interaction with defendant at his vehicle. Instead, defendant asserts that "[t]he unlawful seizure occurred after Officer Alcott brought the defendant and the other individuals to the front of the vehicle, handcuffed them[,] then recovered the bullets from the console and searched the defendant and recovered another bullet." Defendant further asserts that handcuffing him and his two passengers "may very well have turned this benign encounter into an arrest, therefore requiring probable cause to search the vehicle." Thus, defendant argues that the lower courts properly suppressed all of the recovered evidence because the officers' conduct was not justified by probable cause.

¶ 31    Both the fourth amendment and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. This court has explained that "[t]he 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." *People v. McDonough*, 239 Ill. 2d 260, 266 (2010) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

¶ 32    As the parties' respective arguments demonstrate, central to this appeal is the United States Supreme Court's landmark decision in *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Court held that a brief investigatory stop, even in the absence of probable cause, is reasonable and lawful under the fourth amendment when a totality of the circumstances reasonably lead the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous. *Terry*, 392 U.S. at 30; see also *People v. Close*, 238 Ill. 2d 497, 505-06 (2010) (recognizing that this court follows *Terry* and adheres to its standards when reviewing the propriety of investigatory stops under the Illinois Constitution).

¶ 33    Explaining its decision to approve of investigatory stops based solely on reasonable suspicion, the *Terry* court noted that it carefully had to balance the need of law enforcement officials to have some flexibility when investigating potential criminal activity with an individual citizen's fourth amendment rights to be protected against unreasonable police interference. *Terry*, 392 U.S. at 10-12. Reviewing the government interests at stake, the Court observed that the government has a general interest in effective crime prevention and detection. This general interest justifies "the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22.

¶ 34    The Court further explained, however, that the "crux" of *Terry* was another, "more immediate" government interest. *Terry*, 392 U.S. at 23. Specifically, the interest in allowing a police officer to "tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 23. Because of the indisputable threat posed to law enforcement officials during the course of investigatory stops, the Court concluded:

   "[W]e cannot blind ourselves to the need for law enforcement officers to protect

themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

¶ 35 While recognizing that a police officer's need to protect himself from danger was important, the government's interest had to be balanced with the fourth amendment rights of an individual citizen to be free from unreasonable searches and seizures. In the Court's view, the proper balance was to afford law enforcement officials "a narrowly drawn authority" to permit a reasonable search for weapons when the officer has reason to believe that the subject of his investigation is armed and dangerous. *Terry*, 392 U.S. at 27.

¶ 36 The *Terry* Court admonished, however, that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." When reviewing the reasonableness of an officer's conduct, it is appropriate to give due weight to "the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

¶ 37 Ultimately, the *Terry* Court held that when a police officer observes unusual conduct that reasonably leads him to conclude criminal activity may be afoot and the individual he is dealing with is armed and presently dangerous, the officer is permitted to stop the individual and make reasonable inquiries. If, however, "nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." The Court also indicated that courts reviewing the propriety of these types of investigatory stops must decide each case on its own unique facts. *Terry*, 392 U.S. at 30-31.

¶ 38 Relevant to the issues here, the United States Supreme Court has extended *Terry* to permit a protective search of a passenger compartment of a vehicle during an investigatory stop. *Michigan v. Long*, 463 U.S. 1032 (1983); see also *Arizona v. Gant*, 556 U.S. 332, 352 (2009) (Scalia, J., concurring) (noting that "the rule of *Michigan v. Long* is not at issue here"). Explaining its decision, the *Long* Court noted that roadside encounters are "especially hazardous," and a police officer may reasonably believe that he is in danger from the possible presence of accessible weapons inside the vehicle. *Long*, 463 U.S. at 1049.

¶ 39 Under *Long*, the investigative search of the passenger compartment should be limited to the area where a weapon may be located or hidden. The search is permissible only when the officers possess a reasonable belief, based on specific and articulable facts and reasonable inferences from those facts, that the individual was dangerous and could gain control of a weapon. As in *Terry*, " '[t]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " *Long*, 463 U.S. at 1050 (quoting *Terry*, 392 U.S. at 27).

¶ 40    This court follows *Terry* and its rationale, and has concluded that a *Terry*-type stop must be justified at its inception, and the " 'police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Close*, 238 Ill. 2d at 505 (quoting *Terry*, 392 U.S. at 21). Although the police officer's level of suspicion need not rise to the level of probable cause, it must be more than an inarticulate hunch. *Close*, 238 Ill. 2d at 505. When reviewing the officer's action, we apply an objective standard to decide whether the facts available to the officer at the time of the incident would lead an individual of reasonable caution to believe that the action was appropriate. *Close*, 238 Ill. 2d at 505.

¶ 41    With these principles in mind, we consider the circumstances presented in this case. The parties agree that the officers' initial approach and their questioning of defendant in his vehicle was lawful. Defendant conceded at oral arguments that his initial encounter with the officers, before he was ordered out of his car and handcuffed, was lawful under *Terry*. Similarly, the appellate court here agreed that defendant's initial encounter with police was proper under *Terry*. Thus, we must decide whether *Terry* justifies the officers' subsequent decision, after seeing the bullet in plain view in the center console, to order defendant and his passengers out of the car, handcuff them, search their persons, and then ultimately search defendant's car and recover the handgun.

¶ 42    Here, the record demonstrates that Officer Alcott and Detective Johnson were in a vulnerable situation when they observed the bullet. It was dusk and the officers were on foot in a parking lot away from their vehicle. The two officers, who had not drawn their weapons, were also outnumbered by defendant and his two passengers, who were in a running car. Finally, the officers had only a brief exchange with defendant prior to their observation of the plain-view bullet. In other words, the officers were forced to make a quick decision based on limited information after seeing the bullet.

¶ 43    Reviewing the actions of Officer Alcott and Detective Johnson under an objective standard, we believe that a reasonably cautious individual in a similar situation could reasonably suspect the presence of a gun, thus implicating officer safety, based on the bullet clearly visible in defendant's center console. Common sense and logic dictate that a bullet is often associated with a gun. Indeed, our appellate court has recognized that a bullet observed inside a vehicle may reasonably indicate the presence of a gun inside that vehicle. *People v. Stack*, 244 Ill. App. 3d 393, 397 (1993); see also *People v. Reincke*, 84 Ill. App. 3d 222, 225 (1980) (reasonable to infer a gun was present inside a car after observing in plain view open boxes of ammunition).

¶ 44    Certainly, based on the presence of a bullet and a reasonable inference that a gun may be present in the vehicle, it was reasonable for Officer Alcott and Detective Johnson to suspect that their safety was in danger. As *Terry* instructs, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. Based on the circumstances of this case, we believe that question must be answered affirmatively.

¶ 45    Similarly, because Officer Alcott and Detective Johnson could reasonably suspect that

their safety was in danger, it was reasonable for them to order defendant and his two passengers out of the vehicle and search them for weapons. In fact, when an officer has a reasonable suspicion during an investigatory stop that the individual may be armed and dangerous, the officer is permitted to take necessary measures to determine whether the person is armed and to neutralize any threat of physical harm. *Terry*, 392 U.S. at 24.

¶ 46 Although defendant and his two passengers were handcuffed, contrary to defendant's suggestion, handcuffing does not automatically transform a *Terry* stop into an illegal arrest. *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989); see also *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("neither handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause"); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (when reasonably necessary, the use of handcuffs does "not necessarily convert a *Terry* stop into an arrest necessitating probable cause"); *People v. Johnson*, 387 Ill. App. 3d 780, 791 (2009) ("[h]andcuffing of a suspect, alone, may not convert a *Terry* stop into an arrest, depending on the circumstances"). Ultimately, the propriety of handcuffing during a *Terry* stop depends on the circumstances of each case. See *Glenna*, 878 F.2d at 972.

¶ 47 Here, we believe that the handcuffing was reasonable and a necessary measure because the officers were outnumbered, it was dusk, and they could reasonably suspect that one or more of the three individuals in defendant's car possessed a gun or would be able to access a gun inside the vehicle if they were not secured by handcuffs. As our appellate court has recognized, in the context of a *Terry* stop, "[t]he law is clear that the determination that handcuffs or other forms of restraint were reasonable and necessary must be based on the totality of the circumstances actually confronting the officer, not on generalizations or remote possibilities." *People v. Arnold*, 394 Ill. App. 3d 63, 72 (2009). Furthermore, defendant does not allege, and nothing in the record suggests, that the police officers used excessive force or that his brief detention while handcuffed and searched was overly intrusive or otherwise exceeded the scope of a limited search for weapons. See *Terry*, 392 U.S. at 25 (protective search for weapons during investigatory stop must be limited to that necessary for the discovery of weapons that could be used to harm officers or others nearby).

¶ 48 Following the officers' recovery of a total of six .454-caliber bullets from the plastic bag and defendant's person, the officers' reasonable suspicion of a gun being present was obviously not dispelled. Instead, as the State argues, the quickly developing situation and the officers' reasonable suspicion that a gun may be present continued to escalate as the officers recovered additional bullets. See *Terry*, 392 U.S. at 30-31 (noting that when nothing in the initial stages of the encounter dispel the officer's reasonable fear for his safety, he is permitted to conduct a limited search for weapons); see also *Gant*, 556 U.S. at 352 (Scalia, J., concurring) (in the context of a protective search under *Long* "the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the [the incident] is completed"). Thus, under the circumstances of this case, and consistent with *Long*'s extension of *Terry* to permit protective searches of a vehicle's passenger compartment during a *Terry* stop, Officer Alcott and Detective Johnson, acting on a reasonable fear for their safety, properly searched the passenger compartment of defendant's vehicle and recovered the .454-caliber handgun under the front passenger floor

mat.

¶ 49    We disagree with defendant's contention, accepted by the lower courts, that Officer Alcott and Detective Johnson were required to first ask him whether he had a valid FOID card before ordering defendant and his passengers out of the car and searching them. Effectively, defendant argues that the officers should have eliminated any legal explanation for his possession of the bullet in the center console, *i.e.*, established defendant was committing a weapons offense, before investigating further or suspecting him of being potentially dangerous.

¶ 50    The problem with defendant's argument is that it ignores *Terry*'s clear instruction that "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime." *Terry*, 392 U.S. at 26-27. The focus in *Terry* on protective weapon searches is the officer's reasonable belief that his safety or the safety of others is in danger, *regardless* of whether probable cause exists to arrest for a crime. *Terry*, 392 U.S. at 27. Thus, *Terry* does not support defendant's assertion that the officers here were first required to prove he possessed the bullet illegally.

¶ 51    Even assuming *arguendo* that defendant possessed a valid FOID card, that does not necessarily mean that Officer Alcott and Detective Johnson would have had no reasonable basis to suspect their safety was in danger. Notably, the United States Supreme Court has determined that the validity of a *Terry* protective weapon search does not always depend on whether the weapon is possessed illegally. See *Adams v. Williams*, 407 U.S. 143, 146 (1972) (concluding that a protective search for weapons under *Terry* may be "equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law"). Although the circumstances will vary with each case, the risk to a police officer posed by a potentially armed individual is not always eliminated simply because the weapon is possessed legally.

¶ 52    Accordingly, consistent with *Terry* and *Long*, we conclude that defendant's fourth amendment constitutional rights were not violated by the officers' conduct under the circumstances of this case. Following the initial lawful *Terry* stop and the observation of the bullet in plain view in defendant's center console, the conduct of Officer Alcott and Detective Johnson was justified by their reasonable suspicion that a gun was present that threatened their safety. The officers' conduct and resulting protective searches were properly limited to locating that gun and neutralizing the threat. Consequently, we conclude that the recovered bullets and handgun are admissible as evidence. See *Terry*, 392 U.S. at 31 (weapons seized during a protective search for weapons during a *Terry* stop are admissible).

¶ 53    Respectfully, the dissent is mistaken when it frames the issue in this appeal. Here, the issue has always been whether the police officers' observation of the bullet justified their subsequent actions under *Terry*.

¶ 54    Although both lower courts found in defendant's favor and suppressed all of the recovered evidence, *neither* lower court based its judgment on the reasoning advanced by the dissent here—the lack of reasonable suspicion under *Terry*. *Infra* ¶ 104 (Burke, J., dissenting, joined by Freeman, J.). To the contrary, the trial court initially found that the recovered

bullets were properly admitted under *Terry*. On reconsideration, however, the trial court found that all of the recovered evidence should be suppressed because the officers did not obtain probable cause after they failed to ask defendant whether he possessed a valid FOID card.

¶ 55    Similarly, the appellate court majority concluded that all of the recovered evidence should be suppressed based on the lack of probable cause for a search incident to arrest. Notably, even though finding in defendant's favor and refusing to consider the merits of the State's argument under *Terry*, the appellate court majority, whose judgment the dissent would affirm, nevertheless determined that, initially, "the officers engaged in a lawful *Terry* stop." 407 Ill. App. 3d at 310. In other words, the propriety of the initial stop under *Terry* was not contested in the lower courts. Illustrating this point, even the appellate court majority and dissent agreed that the incident began as a lawful *Terry* stop. See 407 Ill. App. 3d at 310 (majority concluding "officers engaged in a lawful *Terry* stop"); 407 Ill. App. 3d at 311 (Lampkin, J., dissenting) (agreeing that the initial encounter was a proper *Terry* stop).

¶ 56    Notably, the dissent fails to cite any support for their position in defendant's brief. Supporting our interpretation of defendant's argument, defendant clearly states in his brief that "[t]he only other factor giving rise to a *Terry* evaluation is an observation of a single round of what appeared to be rifle ammunition sticking out of the plastic bag in the center console." Appellee brief at 3. Similarly, a few sentences later, defendant contends that although the officers observed a bullet in plain view, "[t]here is nothing in the record as to why, according to *Terry*, the officers did not make 'reasonable inquiries' as to the defendant's possession of a valid FOID card." Appellee brief at 4. Thus, as we identified above (*supra* ¶ 29), defendant contests the State's position that *Terry* justifies the officers' conduct after they observed the plain-view bullet in defendant's center console. In particular, defendant argues that *Terry* does not support the officers' conduct because the surrounding circumstances in this case were "absolutely benign." Appellee brief at 1. Although we reject defendant's characterization of those circumstances, contrary to the dissent's position, we address his claim as he presents it.

¶ 57    Furthermore, even assuming *arguendo* that defendant's position was ambiguous in his appellee brief, any ambiguity was eliminated at oral arguments. See, *e.g.*, *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 72 (Freeman, J., concurring in part and dissenting in part, joined by Burke, J.) (noting that "oral argument can play an important part in an appeal because attorneys have, at times, conceded points during the argument that were not conceded in the written brief"). Here, in response to questioning from Justice Theis at oral argument, defense counsel conceded that *Terry* would have allowed the officers, upon seeing the bullet, to ask the occupants out of the car and subject them to a pat-down search. Indeed, when Justice Theis asked if *Terry* applied "right there" when the occupants were ordered out of the car, defense counsel said "yes," and when Justice Theis asked if, pursuant to *Terry*, the officers had a right to a pat-down search, defense counsel replied, "yes, yes of course."

¶ 58    Obviously, defendant could not have made these concessions if he did not agree that this incident began as a proper *Terry* stop. If, as the dissent maintains, defendant actually meant to argue that *Terry* was inapplicable or was not yet triggered, he would have answered "no"

-12-

in response to Justice Theis's clear questioning. Defendant did not respond in that fashion. Instead, defendant repeatedly argued that, under *Terry*, the observation of a plain-view bullet was insufficient to provide the officers with a reasonable belief that their safety was in danger. In our view, there is no reason that this court should refuse to accept defendant's presentation of his argument.

¶ 59 Thus, we have simply addressed defendant's argument as he presents it. If the dissent wishes to address defendant's argument in a different fashion, it may. Typically, though, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (Internal quotation marks omitted.) *People v. Givens*, 237 Ill. 2d 311, 323 (2010). We continue to adhere to that principle here.

¶ 60 Effectively, the dissent contends that *Terry* does not permit a protective search for weapons when investigating officers, standing outside a vehicle that contains three occupants, observe a plain-view bullet in the vehicle and the officers reasonably suspect that one or more of the occupants may be armed and pose a danger to the officers' safety. *Infra* ¶¶ 94-104 (Burke, J., dissenting, joined by Freeman, J.). The dissent, however, provides no support for its position that, under the circumstances of this case, the officers were required under *Terry* to ignore the bullet in plain view, or otherwise discount the officers' reasonable belief that their safety was in danger. Supporting our conclusion here, however, is ample authority upholding protective sweeps of vehicles when the police observe ammunition in plain view. See, *e.g.*, *United States v. Baker*, 47 F.3d 691 (5th Cir. 1995) (search of passenger compartment of vehicle supported by, *inter alia*, observation of bullets in plain view on car's floorboard); *United States v. Shkreli*, 985 F.2d 576 (9th Cir. 1993) (police entitled to search vehicle for weapon after observing three live nine-millimeter bullets and one empty nine-millimeter bullet casing in plain view in the rear of the passenger compartment of the defendant's car and finding two loaded ammunition magazines during a consensual search of the glove compartment); *United States v. Richards*, 967 F.2d 1189 (8th Cir. 1992) (limited sweep of passenger compartment permissible after officer observed .22-caliber cartridges sitting in plain view in the passenger compartment); *United States v. See*, No. 1:07 CR 367, 2007 WL 4287853 (N.D. Ohio Dec. 5, 2007) (observation of bullet in plain view on car's floorboard allowed officers to conduct cursory sweep for weapons under driver's seat), *rev'd on other grounds*, 574 F.3d 309 (6th Cir. 2009); *State v. Garcia Garcia*, 821 P.2d 191 (Ariz. Ct. App. 1991) (officer safety concerns allowed police to search passenger compartment of vehicle after they observed bullets on the front seat, even though occupants had been removed from car); *State v. Conger*, 375 N.W.2d 278 (Iowa App. 1985) (police observation of defendant dropping a bullet after he was stopped for speeding allowed police to search the passenger compartment of the defendant's truck); *State v. Wright*, 763 P.2d 49 (Nev. 1988) (observance of bullet in plain view on car's floorboard could reasonably indicate the presence of a gun and thus allowed police to search the passenger compartment for weapons to ensure their safety); *People v. Ragland*, 549 N.Y.S.2d 249 (N.Y. App. Div. 1989) (police who stopped defendant's car for suspected traffic violation and noticed box of bullets in plain view had right to order defendant out of car and frisk him for weapons); *People v. Catalano*, 512 N.Y.S.2d 626, 630 (N.Y. Sup. Ct. 1987) ("[a] question not presented here is whether the police initially had sufficient information to justify a search of the car (the sight of the bullet

-13-

in open view did that)" (emphasis omitted)); *Commonwealth v. Glessner*, 486 A.2d 521, 523 (Pa. Super. Ct. 1985) ("[w]hen Officer Jackson observed live bullets on the floor of the car, he could then conduct a patdown of [the defendant's] person for his own safety"); *Carter v. State*, No. C14-92-01023-CR, 1994 WL 400916 (Tex. App. Aug. 4, 1994) (officer's observance of box of bullets when driver opened the glove box allowed him to ask driver to submit to a pat-down search; it was reasonable to assume that if bullets were present, a gun was present); *People v. Magras*, Nos. F297/2009-F299/2009, 2010 WL 7371465 (V.I. Mar. 26, 2010) (observation of ammunition on car's floorboard allowed officers to conduct a protective sweep of vehicle's passenger compartment); *State v. Reyes*, No. 32481-4-II, 2006 WL 1321290 (Wash. Ct. App. May 16, 2006) (observance of bullets in plain view on car's floor allowed a protective sweep of passenger compartment and search of an unclaimed backpack that was near the bullets); *cf. United States v. Thomas*, No. 06-5012-01-CR-W-FJG, 2007 WL 62694 (W.D. Mo. Jan. 8, 2007) (after retrieving bullets from defendant's pocket, a search of the vehicle and further detention were appropriate under *Terry*, based on heightened suspicion of criminal activity); *People v. Morales*, 603 N.Y.S.2d 319, 320 (N.Y. App. Div. 1993) ("[t]he presence of bullets permits an inference that a gun is near at hand, and would constitute probable cause for a search [citation] even absent the factor of threat to personal safety"); *State v. Olofson*, 568 N.W.2d 786 (Wis. Ct. App. 1997) (discovery of bullets during pat down of defendant allowed police to search vehicle for weapons); *State v. Williamson*, 206 N.W.2d 613 (Wis. 1973) (after police found bullets on driver's person during a pat-down search, they were entitled to search the vehicle for a gun).

¶ 61 Ultimately, the dissent's position would require us to hold that police officers must ignore a bullet in plain view and first establish that defendant committed a crime *before* conducting a protective search for weapons. *Terry*, however, clearly rejected such a conclusion when it determined that "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime." *Terry*, 392 U.S. at 26-27.

¶ 62                                   III. CONCLUSION

¶ 63 For the reasons stated above, we reverse the judgments of the appellate court and circuit court that suppressed the evidence in this case.

¶ 64 Appellate court judgment reversed.

¶ 65 Circuit court judgment reversed.

¶ 66 JUSTICE THOMAS, specially concurring:

¶ 67 On the evening of June 29, 2006, a detective and a police officer approached a vehicle to determine why it was blocking the entrance to a hotel parking lot. Shortly after arriving at the vehicle, the officers observed immediately accessible ammunition in the center console and took decisive action to protect themselves. According to two members of this court, this was *unreasonable* under the fourth amendment. I submit that the unreasonable thing would

be to deny police officers in this situation the right to protect themselves. I thus concur in the majority opinion, but write separately to explain more fully why I believe that the majority is correct and the dissent is not.

¶ 68 First, conspicuously absent from the dissent is the citation of any case law denying the police the right to conduct a protective search after they have observed ammunition in plain view while questioning the occupants of a vehicle. Certainly the fact that the dissent cannot cite a single case supporting its view calls into question its conclusion. *Infra* ¶ 100 (Burke, J., dissenting, joined by Freeman, J.). Moreover, as clearly demonstrated by the majority opinion, the dissenting justices consider the majority position to be erroneous only because they refuse to acknowledge the concessions that defense counsel made at oral argument.[1] As noted by the majority, defense counsel specifically conceded that *Terry* would have allowed the officers to conduct a pat-down search of the vehicle's occupants. I do not see how defense counsel could make this concession without also conceding that this began as a proper *Terry* stop, and the dissent makes no effort to explain how this would be possible.

¶ 69 Second, even apart from defendant's concession, I believe that the police had the requisite reasonable suspicion of criminal activity. That suspicion was fully formed when they saw, immediately accessible to the vehicle's occupants, "the largest pistol round" they had ever seen. I disagree with the dissent's conclusion that the police possessed nothing more than an "inarticulate hunch." *Id.* ¶ 95. "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). Moreover, "reasonable suspicion" is not only less than probable cause but "*considerably less* than proof of wrongdoing by a preponderance of the evidence." (Emphasis added.) *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In determining whether reasonable suspicion exists, the totality of the circumstances must be considered. *Id.* at 8.

¶ 70 In determining that the police lacked the requisite reasonable suspicion, the dissent cites two cases—neither of which addresses the issue of whether the police may search a vehicle for weapons when they see a bullet in plain view—for the proposition that "[a] bullet is not contraband." *Infra* ¶ 97 (Burke, J., dissenting, joined by Freeman, J.). But that is not the point. The point is that "[t]he presence of a bullet could reasonably indicate the presence of a gun" (*Wright*, 763 P.2d at 50), and "[w]hile possession of ammunition *** may be legal ***, innocent conduct may nonetheless create reasonable suspicion that criminal activity is afoot" (*Magras*, 2010 WL 7371465, at *6). Again, we must consider the totality of the circumstances, and context is key. If the police see a box of rifle shells on the front seat of a pickup truck in downstate Illinois on a fall afternoon, and there is a gun rack on the back of the truck and the driver is wearing a camouflage hunting vest and blaze orange cap, then the presence of ammunition likely does not create a reasonable suspicion of criminal activity. Here, by contrast, the police were in an urban setting at dusk, three individuals were parked in a vehicle with the engine running, blocking the entrance to a hotel parking lot, and the

---

[1]The oral argument may be viewed on this court's website at http://state.il.us/court/Media/On_Demand.asp.

officers observed what looked like the largest pistol round they had ever seen in a plastic bag in the center console. I believe that this created the requisite minimal, objective justification for a *Terry* stop. As the State points out, for instance, a person commits the Class 4 felony of aggravated unlawful use of a weapon if he or she has an uncased and unloaded firearm in a vehicle and the ammunition is immediately accessible. See 720 ILCS 5/24-1.6(a)(1), (3)(B) (West 2010). Here, the ammunition was immediately accessible, and the presence of the ammunition reasonably indicated the presence of a gun. Certainly this created a *reasonable suspicion* that defendant was committing aggravated unlawful use of a weapon.[2]

¶ 71    Next, the dissent takes it as a given that the police may never engage in a protective weapons search for their own safety unless they have a reasonable, articulable suspicion of criminal activity. See *infra* ¶ 109 (Burke, J., dissenting, joined by Freeman, J.). In fact, this is actually a hotly contested issue in the federal courts, with some circuits taking that view, but others holding that the police may conduct protective frisks for weapons even during consensual encounters. See 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 841 n.13 (5th ed. 2012) (noting conflict in the courts). For instance, the Fourth and Eighth Circuits have held that a frisk requires suspicion of criminal activity. See *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000); *United States v. Gray*, 213 F.3d 998 (8th Cir. 2000).[3] By contrast, the First, Ninth, and Eleventh Circuits have upheld frisks solely on the basis of officer safety. See *United States v. Romain*, 393 F.3d 63, 75-76 (1st Cir. 2004); *United States v. Orman*, 486 F.3d 1170, 1176-77 (9th Cir. 2007);[4] *United States v. Bonds*, 829 F.2d 1072, 1075 (11th Cir. 1987). The principal reasons several courts have upheld the right to frisk for weapons

---

[2]The dissent asserts that the police had nothing more than an "inarticulate hunch" that a handgun was being transported illegally in the vehicle. *Infra* ¶ 95 (Burke, J., dissenting, joined by Freeman, J.). This is clearly not correct. The suspicion was based on the *immediately accessible handgun ammunition*. If immediately accessible handgun ammunition in the center console does not at least create a *reasonable suspicion* that a firearm is being transported illegally, one wonders what evidence would do so.

[3]The Eighth Circuit has not been consistent, however, upholding frisks based solely on safety concerns in *United States v. Ellis*, 501 F.3d 958, 961-63 (8th Cir. 2007) ("[j]ustification for a protective pat-down based upon a fear for officer or bystander safety can arise after the commencement of either an investigative stop or a consensual encounter"), and *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000) ("Davis's assertion that the suspicion justifying a protective frisk must be present at the outset of an investigative stop also fails to recognize the analytical distinction between investigative stops and protective frisks. The danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced.").

[4]Attempting to demonstrate that there is no conflict in the federal courts, the dissent argues that *Orman* was overruled by *Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011), which is an interesting assertion given that *Liberal* involved an unlawful stop rather than a consensual encounter, did not discuss consensual encounters in any fashion, and did not cite *Orman*. See generally *Department of Public Works & Buildings v. Farina*, 29 Ill. 2d 474, 479-80 (1963) (judicial opinions must be read in light of facts involved and are authority only for what is actually decided).

during consensual encounters were thoroughly spelled out by Justice Baldock in his dissent in *United States v. House*, 463 F. App'x 783, 793 (10th Cir. 2012) (Baldock, J., dissenting): first, "the strong governmental interest in officer safety is present even in consensual encounters"; second, "requiring reasonable suspicion of criminal activity would hamstring officers' ability to investigate suspicious behavior"; and third, "requiring reasonable suspicion of criminal activity before a frisk would prevent officers from taking 'reasonable steps to ensure their safety' during consensual encounters." *Id.* at 791-93. Moreover, the reason that Justices Burke and Freeman are forced to rely on Justice Harlan's special concurrence in *Terry* is that the Supreme Court in *Terry* did *not* limit the right to search for weapons only to those cases in which the police have a reasonable suspicion of criminal activity. Rather, the *Terry* majority held that the rules for protective frisks "will have to be developed in the concrete factual circumstances of individual cases." *Terry v. Ohio*, 392 U.S. 1, 29 (1968).

¶ 72 According to the dissent, this conflict was put to rest by *Arizona v. Johnson*, 555 U.S. 323 (2009), a decision that did not involve consensual encounters. The dissent is correct that the government in that case argued that the police do not always need a reasonable suspicion of criminal activity before conducting a frisk. However, the attorneys for both the State of Arizona and the United States argued that the Court did not need to resolve that issue if it found that the passengers had been lawfully seized, and that is what the Court ultimately determined. As that Court has itself pointed out, the words of its opinions must be read in light of the facts under discussion. *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944).

¶ 73 The dissent notes that, at the oral argument in *Johnson*, Justice Stevens was skeptical of the government's argument. The dissent does not mention, however, that Chief Justice Roberts and Justice Breyer were equally as skeptical of the defendant's argument that the police may *never* act to protect themselves absent a reasonable suspicion of criminal activity. For instance, Chief Justice Roberts pointed out that there may be a situation in which a person who appears to be armed and dangerous approaches an officer, instead of vice versa. Chief Justice Roberts asked if the rule was like that of the Old West where "the sheriff has to wait for the defendant to draw first." He then expressed skepticism that an officer who finds himself in a situation where he may be shot cannot do anything about it, "not even a simple pat down." Transcript of Proceedings, *Arizona v. Johnson*, at 30 (Dec. 9, 2008) (Roberts, C.J.). Justice Breyer then raised a concern that is the same as one that I raise later in this special concurrence: there may be situations in which officers who are not investigating crimes but engaging in some other legitimate police activity come into close contact with people whom they believe to be armed and dangerous:

"Suppose we go beyond. I mean, once we go beyond, I become a little at sea as to what the answers are because policemen do things other than investigate crime.

A policeman is on protective duty. The individual he is protecting is approached by a member of the Crips gang, who has a bulge in his pocket. Can the police, with reasonable grounds to think that the person is armed, pat down that person? Or is he supposed to wait until the gun comes out of the pocket and the person who is being protected is shot?

A policeman is on a bridge. Somebody stops the car in the middle of the bridge. Traffic is held up in all directions. The policeman goes to try to remove the car from the bridge. In the back seat is a member of the Crips gang with a bulge in his pocket. Is the policeman supposed to ignore that?

I mean, policemen do many things, and once you tell me that we're going beyond the facts of this case, I can think of all kinds of hypotheticals that aren't so hypothetical, and I become uncertain about when the policeman can and when he cannot.

So how do you respond?" Transcript of Proceedings, *Arizona v. Johnson*, at 46-47 (Dec. 9, 2008) (Breyer, J.).

I simply cannot agree with the dissent's suggestion that the Supreme Court meant to put all of these difficult questions to rest by *not* addressing them in a case in which they were not required to do so.

¶ 74    Regardless, however, even if one accepts the view that the police generally are not allowed to frisk for their own safety during consensual encounters, the dissent fails to acknowledge that this case falls within an exception to that rule. Here, the police did not know that defendant and his companions were dangerous until they were already in their presence. No one disputes that the police had a right to approach defendant's vehicle and ascertain why defendant was blocking the entrance to the hotel's parking lot. Only *after* the police were already at the vehicle did they have reason to believe that defendant and his companions were armed and dangerous, and at this point it was too late for the officers to avoid the encounter. The dissent cites Professor LaFave for the proposition that " 'if an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed.' " *Infra* ¶ 99 (Burke, J., dissenting, joined by Freeman, J.) (quoting 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 841 (5th ed. 2012)). The reason given by Professor LaFave is that "in such a case the officer may protect himself by not engaging in the confrontation." 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 841-43 (5th ed. 2012). The dissent neglects to inform the reader of the next two sentences in Professor LaFave's treatise: "But there is a limited exception to the latter principle. If the officer has commenced a nonseizure confrontation without a pre-existing reasonable suspicion supporting a frisk, but such suspicion suddenly appears (most likely because of the suspect's conduct), then the officer is entitled to frisk for his own protection." *Id.* at 843. That is precisely what happened here. When the officers approached the vehicle, they had no reason at all to suspect that the vehicle's occupants were armed and dangerous, so it makes no sense to argue that they should have avoided the encounter. Only *after* the nonseizure interrogation had commenced did they develop a reasonable suspicion that the vehicle's occupants were armed and dangerous. Accordingly, the officers were entitled to frisk the vehicle's occupants. *Id.* Thus, *even under the dissent's view of the law*, the search here was permissible under an exception to the rule that the dissent relies upon. In other words, the entire dissent is spent setting up and knocking down a straw man.

¶ 75    The dissent would leave the officers with a Hobson's choice: (1) simply leave the scene,

knowing that three young men are in a car blocking the entrance to a motel parking lot at night with ammunition—and quite possibly a firearm—in the vehicle; or (2) continue to question the men, thus putting their own lives at risk in a situation in which they are outnumbered and they know there is quite possibly a firearm in the car. In his *House* dissent, Justice Baldock explained why several federal circuits have been unwilling to put the police in such a position:

> "[R]equiring reasonable suspicion of criminal activity before a frisk would prevent officers from taking 'reasonable steps to ensure their safety' during consensual encounters. *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). Under this approach, an officer only has two options if he suspects a person he has consensually encountered may be armed and dangerous. First, he may choose to end the encounter and walk away. This is a nonsensical option, because it requires the officer to abandon the legitimate and non-intrusive performance of his duties and exposes him to potential danger in effectuating his retreat. Second, the officer may continue asking questions in hopes of acquiring adequate suspicion of criminal activity to justify a frisk. But this requires the officer to remain in a dangerous situation without taking any steps to ensure his safety. Officers should not be forced to decide between these equally bad options." *House*, 463 F. App'x at 793-94 (Baldock, J., dissenting).

The touchstone of the fourth amendment is reasonableness (*United States v. Knights*, 534 U.S. 112, 118 (2001)), and the choice that the dissent offers to police officers is not reasonable. If the issue were squarely before us, I would be inclined to agree with those circuits that have not required, in every case, that the police have a reasonable suspicion of criminal activity before conducting a protective frisk for weapons. However, for two reasons, it is not necessary to resolve that question today: first, the police had the requisite reasonable suspicion of criminal activity, and second, even if they did not and this remained at all times a consensual encounter, then the frisk was permissible under an exception that allows for a frisk when the reasonable suspicion that a person is armed and dangerous arises after the consensual encounter has already commenced.

¶ 76    Finally, one related point that I will mention—but not dwell upon as the State does not argue it—is that it appears that this encounter began as a perfectly proper exercise of the police's community caretaking function. Determining why a car is blocking the entrance to a business's parking lot would seem to be precisely the type of function we described in *People v. Luedemann*, 222 Ill. 2d 530, 545-46 (2006), as being within the type of duties that police officers perform unrelated to the investigation of crime.[5] In his treatise, Professor

[5]The dissent appears to be confused by my use of the term "community caretaking," because that is a term that the courts use to uphold seizures as reasonable under the fourth amendment when the police are engaged in activities other than the investigation of crime. *Infra* ¶¶ 116-17 (Burke, J., dissenting, joined by Freeman, J.). But, as we explained in *Luedemann*, the term "community caretaking" "refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime." *Luedemann*, 222 Ill. 2d at 545. My point in using the term here is simply to illustrate that there are situations other than the investigation of criminal activity

LaFave explains that there are instances other than investigating a suspect for possible criminal behavior when the police may find themselves in the presence of a person they believe to be armed and dangerous. 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 839 (5th ed. 2012). He notes that the proposition that the police may avoid a person they believe to be dangerous applies only when the police officer has *unnecessarily* put himself in a position of danger by not avoiding an individual he believes to be armed and dangerous. By contrast, he explains that the officer may conduct a protective frisk when he has "*some legitimate basis* for *** being in immediate proximity to the person." (Emphasis added.) *Id.* In the footnote supporting this statement, Professor LaFave cites *United States v. King*, 990 F.2d 1552 (10th Cir. 1993), which held that, where a police officer as part of his community caretaking function approaches a stopped car in a traffic jam, he was entitled for self-protection to order the driver out of the car upon seeing a gun on the seat. 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 840 n.8 (5th ed. 2012). This certainly suggests that Professor LaFave recognizes that, if an officer's community caretaking function brings him into close proximity to a person he believes to be armed and dangerous, then he has the "legitimate basis" that would allow him to conduct a protective weapons search. This discussion should also make clear that the dissent is simply wrong when it flatly asserts that the police must always suspect someone of criminal activity before conducting a frisk. *Infra* ¶ 113 (Burke, J., dissenting, joined by Freeman, J.).[6] Again, Professor LaFave is careful to word the requirement as that the police must have some *legitimate basis* for being in the immediate proximity of the person. 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 839 (5th ed. 2012); see also *id.* at 857 (when distinguishing between suspicion of crimes that support a frisk all on their own and those that require a suspicion that the subject is armed and dangerous, treatise lists in latter category "legitimate noncriminal reason[s]" and "when the officer's duties otherwise necessitate his being in close proximity to the individual"). And, notably, the dissent never explains why it believes that it is unreasonable under the fourth amendment for a police officer to take immediate action to protect himself when his legitimate job duties bring him into close proximity with an individual that he believes to be armed and dangerous.

¶ 77    Keeping in mind that the touchstone of the fourth amendment is reasonableness, it makes perfect sense that police officers should be able to protect themselves in these situations. It cannot be the case that what is reasonable under the fourth amendment is that police officers

---

in which an officer's legitimate job duties may bring him into close proximity to an individual he believes is armed and dangerous and that it is not reasonable to deny these officers the right to protect themselves. By upholding seizures as reasonable under the fourth amendment when officers are acting in a community caretaking capacity, the courts have obviously not set forth all of the rules that apply to officers acting in such a capacity. However, if it would help to avoid any confusion, the reader is certainly free to substitute some other term such as "public safety" or "public assistance" for "community caretaking."

[6]Indeed, the principal case cited by the dissent for this proposition is *Johnson*, a case in which the Supreme Court unanimously upheld the right of the police to frisk people for whom they had *no* suspicion of criminal activity.

who stop vehicles for even the most minor traffic violations can do protective sweeps for their safety when they see bullets in plain view, but police officers who are acting in a legitimate community caretaking capacity may not. Regardless, however, I believe that this determination can be put off to another day, as the State has not made this argument, and I believe that, here, the police did have a reasonable suspicion of criminal activity.

¶ 78    JUSTICE BURKE, dissenting:

¶ 79    The threshold question presented in this appeal is whether the mere sight of a single bullet inside an occupied parked car provides a police officer with the reasonable suspicion of criminal activity required to seize a person under *Terry v. Ohio*, 392 U.S. 1 (1968). The majority does not address this question, however, finding that defendant has conceded the existence of reasonable suspicion of criminal activity and the legality of his seizure. Because I do not agree that defendant has conceded these issues, and because I believe the police officers in this case lacked any reasonable suspicion of criminal activity on the part of defendant, I must respectfully dissent.

¶ 80                                          I

¶ 81    The facts, briefly summarized, are as follows. On June 29, 2006, at 8:45 p.m., Homewood police officer William Alcott and his partner, Detective Johnson of the Glenwood police department, were driving near the Super 8 Motel in East Hazel Crest, Illinois. The officers were patrolling for underage parties at the motel. They saw defendant's parked car, which was idling near the motel's front door and blocking one of the two entrances to the parking lot. Defendant was in the driver's seat, and a second person was in the passenger seat. The officers parked near defendant's car, got out, and approached. As they did so, a third individual exited the motel and got into defendant's car. Alcott approached the driver's side window and told defendant that he was blocking the entrance to the parking lot. Defendant replied that they were there to pick up someone. Johnson, who was located at the passenger side of the car, motioned to Alcott and stated that a plastic bag was visible in the center console. When Alcott shined his flashlight on the bag, he saw a single bullet sticking out of the bag. Alcott described the bullet as looking "almost *** like a rifle round" and as "the largest pistol round" he had ever seen.

¶ 82    Upon seeing the bullet, Alcott ordered defendant and the two passengers out of the car and immediately handcuffed all three individuals at the front of the vehicle. Johnson then retrieved the plastic bag from the center console. The plastic bag contained a total of five live rounds of .454 ammunition. Alcott patted down defendant and retrieved a sixth round of .454 ammunition from defendant's pants pocket. At that point, Johnson searched the vehicle's interior and discovered a .454 revolver under the front passenger floor mat. The officers transported all three individuals to the police department.

¶ 83    Defendant was subsequently charged with several weapons offenses. He filed a pretrial motion to quash arrest and suppress evidence, which was ultimately granted by the circuit court. The circuit court concluded that the initial approach by the police officers to defendant's car was a consensual encounter that did not implicate the fourth amendment.

-21-

However, according to the circuit court, the removal of defendant from his car and subsequent handcuffing constituted an arrest that was not supported by probable cause. Accordingly, the circuit court ordered the suppression of the bullets and revolver as the fruits of the unlawful arrest. The appellate court, with one justice dissenting, affirmed. 407 Ill. App. 3d 294.

¶ 84                                                          II

¶ 85    The fourth amendment to the United States Constitution, which applies to the states via the fourteenth amendment (*Mapp v. Ohio*, 367 U.S. 643 (1961)), and article I, section 6, of the Illinois Constitution of 1970 guarantee the right of the people to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Warrantless searches and seizures are considered unreasonable under the federal and state constitutions unless they fall within one of a few well-defined exceptions. *People v. Pitman*, 211 Ill. 2d 502, 513 (2004). One such exception is the "stop and frisk" recognized in *Terry v. Ohio*, 392 U.S. 1 (1968).

¶ 86    In its most recent decision addressing *Terry*, the United States Supreme Court explained what is required for a stop and frisk to comport with the fourth amendment:

>    "In a pathmarking decision, *Terry v. Ohio*, 392 U.S. 1 (1968), the Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures. The Court upheld 'stop and frisk' as constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009).

¶ 87    This court has consistently applied this two-part rule when addressing the constitutionality of a stop and frisk (see, *e.g.*, *People v. Close*, 238 Ill. 2d 497, 505 (2010); *People v. Flowers*, 179 Ill. 2d 257 (1997); *People v. Galvin*, 127 Ill. 2d 153 (1989)), and has held that the *Terry* standards are used to determine the propriety of investigatory stops under article I, section 6, of the Illinois Constitution (*People v. Thomas*, 198 Ill. 2d 103, 109 (2001)). The two-part rule has also been codified by our legislature in the Code of Criminal Procedure (see 725 ILCS 5/107-14, 108-1.01 (West 2010)).

¶ 88    The State maintains that the police officers' actions in this case—ordering defendant out of his car, handcuffing him, patting him down, and searching his car—were all part of a constitutionally valid stop and frisk under *Terry*. Initially, the majority rejects the appellate court's conclusion that the State forfeited its *Terry* argument, finding, instead, that the argument may be addressed on its merits. *Supra* ¶¶ 25-27. I agree with the majority that the State's argument has not been forfeited. I disagree, however, with the way in which the majority goes on to frame its *Terry* analysis.

¶ 89    The majority finds that defendant has conceded the existence of reasonable suspicion of

criminal activity and has conceded the legality of his seizure by the police officers. Thus, according to the majority, the first prong of the *Terry* rule is not at issue and the only question before us is whether the second prong of the *Terry* rule has been satisfied. I disagree.

¶ 90    As the majority itself acknowledges, defendant argues in his brief that the officers' actions in this case resulted in an "unlawful seizure." *Supra* ¶ 30. Defendant further maintains "that Officer Alcott and Detective Johnson could not reasonably believe a crime was being committed" and "that *Terry* does not support the officers' conduct because the surrounding circumstances in this case were 'absolutely benign.' " *Supra* ¶ 56. At oral argument defense counsel continued with this theme. Counsel noted that "in a *Terry* situation there has to be criminal activity afoot," and stated that "Officer Alcott was specifically asked [at the suppression hearing]—was there any criminal activity of any kind? Answer—no." Counsel argued repeatedly that there was "no criminal activity" in this case and nothing that "would give rise to suspicion of any criminal activity." This, of course, is the standard necessary to justify a seizure under the first prong of *Terry*.

¶ 91    However, during oral argument, in response to a question from the bench, counsel contradicted himself and stated that the officers could, under *Terry*, order defendant from the car. Counsel then immediately corrected himself and stated that "we should have a distinction" between ordering and asking people out of their cars, that the police here could only "ask" defendant out of the car and that the police could only perform a "*Terry*-like inquiry." Later, counsel stated that police could conduct a pat down of defendant.[7] Importantly, defense counsel did not attempt to reconcile his contradictory statements and this court did not ask for clarification on this point.

¶ 92    I take it as a given that contradictory statements made by an attorney cannot form the basis of a binding concession, particularly in a criminal case. Recognizing a concession in these circumstances would require this court, after the fact, to pick which of counsel's statements to ignore and which to give credence to. And, indeed, that is what the majority has done here. The majority does not dispute that defense counsel repeatedly argued that there was nothing in this case that "would give rise to suspicion of any criminal activity." Yet, the majority chooses to disregard these assertions. In my view, this is improper. Whatever contradictory positions have been advanced by defendant in this case, he has never retreated from the contention that the police officers lacked reasonable suspicion of criminal activity. I would address that argument.

¶ 93                                          III

¶ 94    As the circuit court held, the initial approach of the police officers to defendant's car was

---

[7]Confusingly, the majority relies on these statements to find that defendant has conceded that his "initial encounter with the officers, before he was ordered out of his car and handcuffed" was a seizure under *Terry*. *Supra* ¶ 41. This, despite the fact that counsel's statements had nothing to do with the officer's initial approach to defendant's car, and despite the fact that the circuit court expressly held that the initial approach was not a seizure.

a consensual encounter. See *People v. Luedemann*, 222 Ill. 2d 530, 552-53 (2006) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). The consensual encounter escalated to a seizure when defendant was ordered out of his car by the officers. See, *e.g.*, 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 595 (5th ed. 2012) ("the encounter becomes a seizure if the officer orders the suspect to 'freeze' or to get out of the car"). Accordingly, the threshold issue in this case is whether the seizure of defendant's person, which took place at the time that the officers ordered defendant out of his parked car, was justified by the presence of reasonable suspicion of criminal activity.

¶ 95 I agree with defendant's assertion that the record is devoid of any facts known to the police officers which might have amounted to anything more than a hunch of criminal activity on defendant's part. See *Terry*, 392 U.S. at 22 (rejecting an "inarticulate hunch" as a basis for a warrantless seizure). Defendant was not in a high-crime area at the time he was seized. Nor had the police officers received any calls of suspicious activity or crimes in the area. It was not late at night and the location of defendant's car, parked in front of a motel entrance, was hardly unusual. Thus, there was nothing to indicate that defendant was "in an unlikely place at an unlikely time." *People v. McGowan*, 69 Ill. 2d 73, 78 (1977).

¶ 96 When the officers approached defendant's car and informed him that he was blocking the entrance to the motel's parking lot, defendant stated that he was picking up someone. Defendant's answer was entirely consistent with the officers' recent observation of an individual exiting the motel and getting into defendant's car. Further, defendant never made any furtive movements or gestures, or appeared agitated, angry or drunk, and there was nothing to indicate that the officers could reasonably suspect they were about to be assaulted or attacked in any way. In short, none of the factors typically associated with establishing reasonable suspicion of criminal activity were present. Instead, as defendant argues, "the circumstances in this case were 'absolutely benign.' "

¶ 97 The State relies on the presence of the bullet in the car to justify defendant's seizure. But no court has held that a bullet observed inside a vehicle, standing alone, establishes the reasonable suspicion of criminal activity that would justify a seizure under *Terry*. A bullet is not contraband. See *United States v. Blom*, 242 F.3d 799, 808 (8th Cir. 2001); *United States v. Lemons*, 153 F. Supp. 2d 948, 959 (E.D. Wis. 2001) (ammunition is not immediately apparent as evidence of unlawful activity because it may be used for hunting, recreational target shooting, or otherwise in connection with a lawfully possessed weapon). Thus, the seizure of defendant was not warranted absent other facts to support a reasonable suspicion that defendant was committing, or about to commit, some crime.

¶ 98 The State contends that the presence of the bullet made it reasonable to suspect that defendant was committing the crime of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1) (West 2010)), an offense which makes it illegal, *inter alia*, to carry a firearm in a car if the weapon is uncased, unloaded and ammunition is immediately accessible, or if the person possessing the firearm lacks a firearm owner's identification card (FOID card).[8]

---

[8]This statute has recently been held unconstitutional. See *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), rehearing *en banc* denied, 708 F.3d 901 (7th Cir. 2013).

See *People v. Zimmerman*, 239 Ill. 2d 491, 497-500 (2010) (describing the offense).

¶ 99　　Defendant, in response, does not dispute that the police officers could, upon seeing the bullet, reasonably assume that a firearm was present in the car. However, defendant notes that even under the aggravated unlawful use of a weapon statute in existence at the time defendant was seized, it was not *per se* "unlawful to carry or possess a firearm in a vehicle." And, as defense counsel maintained at oral argument, the officers could not, simply from the sight of a bullet, reasonably suspect that any firearm in the car was being carried illegally. Thus, according to defendant, there was "not a scintilla of evidence linking the ammunition to any form of criminal conduct." I agree.

¶ 100　　Even if the presence of the bullet made it reasonable to assume there was a gun somewhere in defendant's car, the bullet provided no information as to whether any such gun was cased, or uncased, or whether any of the occupants of the car had a FOID card. In other words, upon seeing a bullet in a car, and nothing else, the police officers had to make a guess that an unseen firearm was being transported illegally—the very thing that *Terry* holds is impermissible. See *Terry*, 392 U.S. at 22 (intrusions upon fourth amendment rights must be based on something "more substantial than inarticulate hunches").

¶ 101　　Other courts have reached the same result, holding that the knowledge of the presence of a firearm does not, by itself, provide reasonable suspicion that the firearm is being transported or carried illegally. See, *e.g.*, *Commonwealth v. Couture*, 552 N.E.2d 538, 541 (Mass. 1990) ("[T]here is absolutely no indication that the defendant in this case was engaged in criminal activity. The mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun, and the stop was therefore improper under Fourth Amendment principles."); *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (an informant's tip that the suspect had firearms in his car did not "permit an officer to suspect—let alone reasonably suspect—that possession of either firearm was illegal or that the firearms were being used in a criminal manner"); *United States v. McHugh*, 639 F.3d 1250, 1257 (10th Cir. 2011) (suspicion that defendant had a weapon in the car, "standing alone, does not establish reasonable suspicion" to justify a seizure under *Terry*); *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) ("a mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, [does not] justify an officer in stopping a suspect absent the reasonable suspicion required by *Terry*" that the firearm was possessed or carried illegally).

¶ 102　　To be sure, if defendant, or the others in the car, had done anything by way of movement or action to create a suspicion that the officers were about to be assaulted, that would have provided the reasonable suspicion of criminal activity to justify seizing defendant. See, *e.g.*, *Narcisse*, 927 N.E.2d at 446 ("When an individual appears to be ready to commit violence, either against police officers or bystanders, it is reasonable to believe that he is 'about to commit a crime,' thus satisfying *Terry*'s first prong."); 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 843 (5th ed. 2012) (if the "suspect's conduct" creates a reasonable suspicion that violence is about to be committed against an officer, the suspect may be seized). However, nothing like that happened here.

¶ 103　　Finally, it is worth noting the consequences that flow from accepting the State's argument

regarding reasonable suspicion of criminal activity. A bullet may be present in a car for any number of reasons that have nothing to do with criminal activity. It may be left over from a hunting trip when the car has not been fully cleaned out or it may be in the car because the driver is taking it to the store to know what type of ammunition to purchase. The State's position would hold that in these instances and, indeed, any time a bullet is in an occupied parked car, a police officer may reasonably assume that criminal activity is afoot and may, therefore, seize the occupant of the car. This is an unreasonable result that sweeps far too broadly.

¶ 104    The mere sight of the bullet did not provide the police officers with the reasonable suspicion of criminal activity required to seize defendant under *Terry*. Accordingly, the stop and frisk of defendant was constitutionally impermissible.

¶ 105                                              IV

¶ 106    Justice Thomas, specially concurring, offers several additional points in support of the majority. I do not find these points persuasive.

¶ 107    First, Justice Thomas contends that focusing on the lack of reasonable suspicion of criminal activity in this case forces the police officers into a "Hobson's choice." *Supra* ¶ 75 (Thomas, J., specially concurring). But this contention rests on the false premise that it would have been wrong for the police officers to let defendant go after they had spoken with him. It would not have been. After speaking with defendant, the officers lacked reasonable suspicion that defendant was engaged in any criminal activity. It can hardly be wrong to let a person go on his way when that person is *not* suspected of any criminal activity.

¶ 108    Raising an argument not advanced by the State, Justice Thomas also questions whether the seizure of defendant had to be justified by reasonable suspicion of criminal activity. Specifically, Justice Thomas suggests that it may have been permissible for the police officers to escalate the consensual encounter with defendant into a protective frisk absent any reasonable suspicion of criminal activity. *Supra* ¶¶ 76-77 (Thomas, J., specially concurring). I cannot agree.

¶ 109    As the United States Supreme Court clearly stated in *Johnson*, the threshold requirement for a stop and frisk is the existence of reasonable suspicion of criminal activity. *Johnson*, 555 U.S. at 326. Justice Harlan explained the rationale behind this requirement in *Terry*:

> "[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection." (Emphasis in original.) *Terry*, 392 U.S. at 32-33 (Harlan, J., concurring).

In other words, there is no " 'freestanding' right to search based solely upon officer safety

concerns." *Speten v. State*, 2008 WY 63, ¶ 23, 185 P.3d 25 (Wyo. 2008). Rather, the right to frisk for weapons arises out of the "need for officer safety during an investigative detention." *Id.*

¶ 110    The requirement of reasonable suspicion of criminal activity has been read broadly. Courts have allowed police officers, for example, to frisk a companion of another person who is engaged in criminal activity or is the subject of a criminal investigation in order to secure the scene and protect the safety of the officer. See generally 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 868-73 (5th ed. 2012). But the underlying requirement remains: To protect the " 'sacred *** right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law' " (*Terry*, 392 U.S. at 9 (quoting *Union Pacific R.R. Co. v. Botsford*, 141 U.S. 250, 251 (1891))), a police officer conducting a stop and frisk must have, in some form, reasonable suspicion of criminal activity. See, *e.g.*, 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 841 (5th ed. 2012) ("if an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed"); *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("*[s]o long as the officer is entitled to make a forcible stop*, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose" (emphasis added)); *Gomez v. United States*, 597 A.2d 884, 891 (D.C. 1991) ("[I]f the officer lacked articulable suspicion to seize [the defendant], the seizure could not be justified upon the notion that it would be dangerous to chat with [the defendant] and his companions without restricting their liberty. No matter how appealing the cart may be, the horse must precede it."); *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000) ("To conduct such a protective search, an officer must first have reasonable suspicion supported by articulable facts that criminal activity may be afoot."); *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) ("a citizen's consent to answer questions cannot, *without more*, supply the reasonable suspicion that criminal activity is afoot needed to justify a pat-down search" (emphasis in original)).

¶ 111    Justice Thomas contends, however, that the law in this area is not settled. According to Justice Thomas, it is a "hotly contested issue" in the federal circuit courts as to whether, in the absence of reasonable suspicion of criminal activity, the police may seize a person in order to engage in a protective weapons search. *Supra* ¶ 71 (Thomas, J., specially concurring). The case law does not support this contention.

¶ 112    *United States v. Romain*, 393 F.3d 63 (1st Cir. 2004), relied upon by Justice Thomas, does not eliminate the requirement of reasonable suspicion of criminal activity. In fact, the court there held that the suspect's behavior "gave rise to a reasonable suspicion that he might have been involved in criminal wrongdoing." *Id.* at 72. *United States v. Bonds*, 829 F.2d 1072 (11th Cir. 1987), is inapposite, as that was a case where a person's home was being investigated pursuant to a search warrant and the defendant, a confederate who arrived at the home, was frisked during that investigation. *United States v. Orman*, 486 F.3d 1170 (9th Cir. 2007), also cited by Justice Thomas, is no longer followed in the Ninth Circuit. More recent decisions, such as *Liberal v. Estrada*, 632 F.3d 1064, 1079 (9th Cir. 2011), have cited to the Supreme Court's decision in *Johnson* and held that both prongs of *Terry* are required for a

stop and frisk. *Id.* at 1079 ("The first *Terry* condition was not met in this case; the traffic stop was unlawful because it did not rest on a reasonable suspicion that a violation of law had occurred. Therefore, it would not have been reasonable for [the police officers] to stop and frisk Plaintiff ***.").

¶ 113    As the *Liberal* court's reliance on *Johnson* shows, the Supreme Court has made it abundantly clear that reasonable suspicion of criminal activity is required to justify a stop and frisk. Indeed, in *Johnson*, the State of Arizona asked the Supreme Court to abandon the first prong of *Terry* and hold that a police officer may stop and frisk someone even in the absence of any suspicion of criminal activity. See Brief of the Petitioner, *Arizona v. Johnson*, 2008 U.S. S. Ct. Briefs LEXIS 748; see also Transcript of Proceedings, *Arizona v. Johnson*, 2008 U.S. Trans. LEXIS 81, at *23 (Dec. 9, 2008) (Stevens, J.) (noting at oral argument that the request to do away with the first *Terry* factor was "a rather extreme position"). The Court did not do so, and decisions issued after *Johnson* have uniformly held that reasonable suspicion of criminal activity is required to justify a stop and frisk. See, *e.g.*, *Liberal*, 632 F.3d at 1079; *Commonwealth v. Narcisse*, 927 N.E.2d 439, 445-46 (Mass. 2010) ("we state expressly that police officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense and is armed and dangerous" (emphasis omitted)); *State v. Dean*, 214 P.3d 1190, 1194 (Kan. App. 2009) ("[A]n officer must be able to point to specific, articulable facts to support reasonable suspicion for *both* the stop and the frisk. *Johnson*, 555 U.S. at ___, 129 S. Ct. at 787. Here, the district court failed to apply this dual requirement when it found [defendant's] pat-down was justified by officer safety concerns but did not determine whether [defendant's] initial detention was justified by reasonable suspicion that [defendant] was engaged in criminal activity." (emphasis in original)); *United States v. Dorlette*, 706 F. Supp. 2d 290, 298 (D. Conn. 2010) ("[A]n officer may 'act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous' by conducting 'a limited search of outer clothing for weapons,' but *only if* the officer has 'already lawfully stopped' the person pursuant to 'suspicion (reasonably grounded, but short of probable cause) that criminal activity is afoot.' *Johnson*, 129 S. Ct. at 786." (emphasis in original)); see also *United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010) ("the government leaped to the officer safety rationale for a protective frisk for weapons, ignoring the mandate in *Terry* that there must be reasonable suspicion of on-going criminal activity justifying a stop before a coercive frisk may be constitutionally employed" (emphasis omitted)).

¶ 114    Notably, the only authority Justice Thomas cites that postdates *Johnson* is a dissent which does not mention that case. *Supra* ¶ 75 (Thomas, J., specially concurring) (citing *United States v. House*, 463 F. App'x 783, 793 (10th Cir. 2012) (Baldock, J., dissenting)). A single dissent's position on an issue does not make that issue "hotly contested."

¶ 115    The Supreme Court has made clear that two conditions must be met for a stop and frisk to comport with the fourth amendment, not one. *Johnson*, 555 U.S. at 326. This two-part rule is the rule we must apply here.

¶ 116    Lastly, advancing an additional argument not raised by the State, Justice Thomas contends "that this encounter began as a perfectly proper exercise of the police's community caretaking function." *Supra* ¶ 76 (Thomas, J., specially concurring). This contention is

-28-

incorrect. As this court has explained, the community caretaking doctrine " 'is invoked to validate a search or seizure as reasonable under the fourth amendment' " where law enforcement officers are performing some function other than the investigation of criminal activity. *People v. McDonough*, 239 Ill. 2d 260, 270 (2010) (quoting *People v. Luedemann*, 222 Ill. 2d 530, 548 (2006)); see generally 4 Wayne R. LaFave, Search and Seizure § 9.2(b), at 382-88 (5th ed. 2012). Thus, when one states that a police officer is engaged in community caretaking, that statement means that the officer has, in fact, seized someone. The seizure must then be justified for reasons that have nothing to do with the investigation of criminal activity, such as, for example, when a police officer sees a person slumped over unconscious on a park bench and has to seize that person in order to provide assistance.

¶ 117 Here, the circuit court expressly held that the police officers' initial approach to defendant's car was a consensual encounter, not a seizure. Neither party challenges this holding and Justice Thomas does not contend that it is incorrect. Accordingly, because there was no seizure, the community caretaking doctrine "is not relevant" to analyzing the propriety of the initial approach by the officers to the car. *McDonough*, 239 Ill. 2d at 271. Moreover, the State has acknowledged that when defendant was, in fact, seized, *i.e.*, when he was ordered out of the car, the officers were engaged in the investigation of criminal activity. Thus, the community caretaking doctrine plays no role in this case.

¶ 118                                                      V

¶ 119 The majority cites a number of cases which discuss the second prong of *Terry* and the propriety of conducting protective frisks when a defendant has been lawfully seized and the first prong of *Terry* has been satisfied. *Supra* ¶ 60. I express no opinion on the correctness of those decisions. My opinion in this case is limited solely to the conclusion that the police officers lacked reasonable suspicion of criminal activity at the time they seized defendant and, thus, the first condition for establishing the constitutionality of a stop and frisk under *Terry* was not met. See *Johnson*, 555 U.S. at 326.

¶ 120                                                     VI

¶ 121 The majority is critical of me for examining the legality of defendant's seizure, pointing out that "neither lower court based its judgments" on the lack of reasonable suspicion of criminal activity in this case. (Emphasis omitted.) *Supra* ¶ 54. But that is exactly my point. Neither the circuit court nor the appellate court made any determination as to whether the police officers had reasonable, articulable suspicion of criminal activity at the time defendant was ordered out of his car. This court, too, has made no determination on this issue, having found that defendant conceded the existence of reasonable suspicion of criminal activity. Thus, the majority upholds the legality of the search of defendant's person and his car despite the fact that the fourth amendment requires reasonable suspicion of criminal activity to justify a stop and frisk (see *Johnson*, 555 U.S. at 326); despite the fact that defendant has argued there was nothing that "would give rise to suspicion of criminal activity" in this case; and despite the fact that no court has held that such suspicion existed. This is wrong.

¶ 122 Because the police officers in this case lacked any reasonable suspicion of criminal

activity on the part of defendant, the stop and frisk of defendant was constitutionally impermissible. Accordingly, I would affirm the judgment of the appellate court that all of the evidence obtained through the searches in this case should have been suppressed. I therefore respectfully dissent.

¶ 123    JUSTICE FREEMAN joins in this dissent.

## Dissenting Opinion Upon Denial of Rehearing

¶ 124    JUSTICE BURKE, dissenting:

¶ 125    As I noted in my previous dissent, the validity of a stop and frisk is "constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). In this case, defendant argued in his brief that the officers' actions amounted to an "unlawful seizure," that the officers "could not reasonably believe a crime was being committed," and that "*Terry* does not support the officers' conduct because the surrounding circumstances in this case were 'absolutely benign.' " *Supra* ¶¶ 29, 30, 56. Thus, defendant clearly maintained that the factual circumstances did not amount to reasonable suspicion of criminal activity pursuant to *Terry* and, thus, did not justify his initial stop or seizure.

¶ 126    The majority, however, ignored defendant's argument regarding the illegality of his seizure. Instead, they accepted a "concession" made by defense counsel during oral arguments when he offered contradictory answers in response to a question from the bench. Counsel first stated that the officers could, under *Terry*, order defendant from his car. Immediately afterward, counsel argued that the police could only "ask" defendant out of the car and perform a "*Terry*-like inquiry." Counsel later responded "yes" when a justice asked whether officers had a right to a pat-down search under *Terry*. This court did not ask defense counsel to clarify his position or to address whether defendant intended to abandon the position argued in his brief.

¶ 127    As my dissent stated, my view is that it was inappropriate for this court to take counsel's conflicting statements made to the bench as a binding concession on an issue of law. Moreover, the majority's decision failed to recognize defense counsel's many statements during oral arguments that there was "no criminal activity" in this case and "nothing that would give rise to suspicion of any criminal activity." The majority erroneously accepted as valid only those statements which appeared to concede the legality of the seizure, while ignoring the many statements establishing that the officers lacked a reasonable suspicion of criminal activity which would warrant the seizure.

¶ 128    Defendant now clarifies in his petition for rehearing that he had no intention of conceding the legality of his seizure. Rather, he asserts that he has "consistently maintained that the

factual situation did *not* give rise to being characterized as a *Terry* stop." (Emphasis added.) Defendant states that, during oral arguments, his counsel's intent was to present an alternative argument in the event that the court upheld the application of *Terry* to this case. The alternative argument counsel meant to pose to the court was that, even if *Terry* applied, the "conduct of the officers far exceeded what was reasonable under the circumstances." Defendant further reiterates in his petition the argument presented in his brief that the surrounding circumstances did not justify the officers' seizure under *Terry*.

¶ 129    I believe that it is improper for this court to avoid reaching an issue of law based on a concession that defendant clearly never intended to make. Because the rehearing stage is defendant's first opportunity to address the court's finding that he conceded a crucial point of law, I would allow rehearing to address defendant's argument that the initial seizure of his person was illegal under *Terry*.