2025 IL App (1st) 231202

First District
Third Division
June 4, 2025

No. 1-23-1202

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 21 CR 1507701 |
| v. | ) ) | |
| | ) | The Honorable |
| CEDRIC SMITH, | ) ) | Vincent Gaughan, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

JUSTICE REYES delivered the judgment of the court with opinion.
Presiding Justice Lampkin and Justice Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury trial, defendant Cedric Smith was convicted of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2020))[1] and was sentenced to 73 months in the Illinois Department of Corrections (IDOC). Defendant now appeals, contending that (1) the trial court should have suppressed the firearm discovered at the traffic stop at which defendant was arrested and (2) the State failed to prove him guilty beyond a reasonable doubt. For the reasons set forth below, we reverse.

¶ 2                                    BACKGROUND

¶ 3    Defendant was a passenger in a vehicle that was stopped by police on November 18, 2021. During the course of the traffic stop, defendant, who had been seated in the back seat on the

---

[1]We note that, effective January 1, 2025, this offense is now known as "[u]nlawful possession of a firearm by a repeat felony offender." Pub. Act 103-822, § 20 (eff. Jan. 1, 2025) (amending 720 ILCS 5/24-1.7). As defendant was convicted prior to the amendment's effective date, we refer to the offense by the name in effect at the time of his conviction.

passenger's side of the vehicle, was arrested after officers discovered a loaded firearm in a bag near his feet. Defendant was subsequently indicted on five counts, including one count of being an armed habitual criminal, two counts of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6 (West 2020)), one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1), and one count of defacing identification marks of firearms (*id.* § 24-5). The State, however, ultimately proceeded only on the armed habitual criminal count and nol-prossed the remaining counts.

¶ 4                              *Motion to Suppress*

¶ 5        Prior to trial, defendant filed a motion to suppress the firearm evidence recovered from the bag, contending that the officers who searched the bag did so without a warrant and without probable cause. The parties came before the trial court for a hearing on defendant's motion on April 21, 2022.

¶ 6        The sole witness to testify during the hearing was Chicago police officer Reynol Cuellar Dela Cruz, one of the officers involved in the traffic stop. Cuellar Dela Cruz testified that, at approximately 8:52 p.m. on November 18, 2021, he and his partner were in an unmarked police vehicle traveling eastbound on 47th Street when they observed a black Chevy Tahoe traveling westbound on the same street. As they passed, he noticed that the front windshield of the Tahoe was cracked, it was lacking a front license plate, there was a broken window on the rear driver's side of the vehicle covered with a plastic bag, and there were "a bunch of bullet holes" on the driver's side of the vehicle. The traffic violations "caught [his] attention," and Cuellar Dela Cruz turned the police vehicle around and pulled behind the Tahoe. His partner ran the rear license plate through the Law Enforcement Agencies Data System (LEADS) while Cuellar

Dela Cruz activated the police vehicle's emergency lights and curbed the Tahoe. As they exited the police vehicle, they learned that the license plate did not belong to the Tahoe.[2]

¶ 7 Cuellar Dela Cruz testified that, as he was approaching the Tahoe, he observed another individual seated in the back, whom he identified in court as defendant. Defendant was "making sudden movements to the floorboard of the vehicle" as Cuellar Dela Cruz approached. Cuellar Dela Cruz testified that he was wearing a body-worn camera during the traffic stop and that it accurately depicted what he observed during the traffic stop. Defense counsel then played the video from the body-worn camera, pausing at various points, and Cuellar Dela Cruz narrated what he observed.

¶ 8 The video, which appears to have been played in its entirety during the hearing, is contained in the record on appeal. As the sequence of events is critical to determining the propriety of the search, we supplement Cuellar Dela Cruz's testimony as necessary with our observations from viewing the video.

¶ 9 The video begins by depicting Cuellar Dela Cruz behind the wheel of a police vehicle, where he curbs a dark SUV at approximately 8:38 p.m. Shortly before stopping the police vehicle, Cuellar Dela Cruz's partner can be observed touching the vehicle's computer. As Cuellar Dela Cruz exits the police vehicle, another police vehicle can be observed immediately in front of the Tahoe, and two officers exit that police vehicle as Cuellar Dela Cruz approaches the Tahoe.

---

[2]We note that, at oral argument, the State indicated that the officers discovered that the plate was "fictitious" when running the passengers' identification documents through the LEADS system, at which point they ordered them to exit the vehicle. While this representation is consistent with the video of the traffic stop, it is inconsistent with the testimony of Cuellar Dela Cruz, who testified that they ran the plate through the system shortly before he turned on the emergency lights of the police vehicle and, when he exited the police vehicle, "at that moment we realized that the plates didn't belong to the vehicle at that point."

¶ 10        From the view as Cuellar Dela Cruz steps out of his vehicle, the back window and three sets of side windows of the Tahoe are visible. Cuellar Dela Cruz testified that the rearmost driver's side window was covered by a plastic bag and that he was unable to observe anything inside the vehicle through that window. He further testified that the middle driver's side window was tinted. When asked by defense counsel whether Cuellar Dela Cruz had observed defendant doing anything suspicious inside the vehicle at this point in the video, he testified that "[i]t was before that. When I was still in the car, that's when we observed your client making sudden movements." He further explained, "[i]t was through the back window of the car, not through the side window, when we observe[d] him making the sudden movements," as both his and his partner's flashlights were pointing toward the back of the vehicle. Cuellar Dela Cruz clarified that, when he had earlier testified that he had observed movement as he was approaching the Tahoe, "I mean, he was moving but he wasn't making the sudden movements that we saw in the beginning when we got out of the vehicle." At the point at which the video was paused, Cuellar Dela Cruz testified that he knew that defendant had something in his hands, as his partner had shined her flashlight through the passenger's side window, but Cuellar Dela Cruz did not know what it was at the time.

¶ 11        Cuellar Dela Cruz testified that he approached the driver's side window and instructed the driver to roll down her window, which she did. When she did, Cuellar Dela Cruz was able to observe that there were three people inside the Tahoe—a female driver, a male passenger, and defendant, who was sitting in the back seat behind the passenger. The video depicts Cuellar Dela Cruz asking the driver for her license and insurance, and the driver responds by asking for the reason for the stop. He explains that she had a broken window and missing license plate, and she asks for his sergeant, as she states he has a "nasty attitude," and begins rolling up her

window. Cuellar Dela Cruz stops her from closing her window entirely, threatening to break her window before placing his hand between the window and the frame. She continues asking for a sergeant, which Cuellar Dela Cruz states is not necessary at this point, and he again asks for her identification. She responds, "your sergeant can get my ID." He then asks the two male passengers for their identification, which they provide. Cuellar Dela Cruz testified that he ran the information for the passengers due to their lack of seatbelts.

¶ 12    The video depicts a female officer then approaching the driver's side of the vehicle, and Cuellar Dela Cruz explains that the driver is being uncooperative. The driver tells the officer that she is from out of state and that Cuellar Dela Cruz was being "nasty," but she indicates that she would be willing to speak to the female officer as long as he was not present. Cuellar Dela Cruz then leaves the driver and walks around the front of the Tahoe to the passenger's side of the vehicle. He takes the identifications from the passengers, then continues to the police vehicle to run them through the vehicle's computer system. It appears that Cuellar Dela Cruz enters information onto a screen on the vehicle's computer labeled "Vehicle Query" and, approximately 30 seconds after he reaches the police vehicle, another officer approaches and Cuellar Dela Cruz tells the officer "You can get them all out." He continues, "the plates don't match to this car, I got enough s*** to get 'em out." He then proceeds to enter the names on the two passengers' identification documents through the vehicle's computer. After approximately two minutes, he exits the police vehicle and returns to the Tahoe; at this point, defendant is standing behind the vehicle, handcuffed, while the driver is still in the front seat. Approximately four additional police vehicles are also visible as Cuellar Dela Cruz walks toward the Tahoe.

¶ 13    The video then depicts Cuellar Dela Cruz returning to the driver's side of the Tahoe, where the driver remains in the front seat; the front male passenger is also still in the vehicle but exits as Cuellar Dela Cruz begins speaking to the driver. Cuellar Dela Cruz asks the driver for her name, but she again indicates that she is only willing to speak to the female officer. Cuellar Dela Cruz continues to speak to her, explaining that, since the vehicle plates do not match the Tahoe, she could be taken to jail but that he could "give her a break" if she spoke with him. She explains that, for personal reasons, she is afraid when interacting with the police, but she listens while he speaks with her, eventually telling him that "y'all can grab that, because I don't want to touch anything," gesturing toward the front of the vehicle. When Cuellar Dela Cruz asks what she is referring to, she responds "my ID."

¶ 14    He then asks her to exit the vehicle, telling her that she can speak to the female officer but that "I have to go through the vehicle." The female officer asks the driver where her identification is, and the driver responds, "I think it's in the car somewhere," again gesturing toward the front of the vehicle. Cuellar Dela Cruz responds, "I got it," and reaches toward the front of the vehicle, next to the steering wheel, and emerges holding several documents and cards. He takes one of the documents, calls the driver by name, and asks, "Is this you?" She gives an affirmative response but says, "that's not the ID that's in there." He then pulls out a Social Security card and asks if it is hers, but she responds that it belongs to her daughter. He then attempts to open the back door on the driver's side but is unable to, and he walks to the passenger's side of the vehicle. As he does so, he speaks in Spanish to another officer.[3] He

---

[3]A transcript of the video, which was contained in the record on appeal, translates this portion as: "Check in the back bro', where that guy was at[;] he was moving a little too much when we approached the car."

then says, "I don't know what he has in there," reaches into the vehicle, and pulls out a dark backpack from the backseat.

¶ 15     Cuellar Dela Cruz testified that, after everyone had exited the Tahoe, he searched the vehicle, including the backpack located behind the center console. Several of the backpack's compartments were partially open, and during his search, Cuellar Dela Cruz recovered a loaded .40-caliber Glock semiautomatic firearm, as well as paperwork containing defendant's name and information. The video depicts that, after searching the bag, Cuellar Dela Cruz asks, "Whose black bag is that?" He then asks who was sitting in the backseat, then approaches defendant and asks, "Is that your black bag?" Defendant denies that it is his. Cuellar Dela Cruz then gives the bag to another officer and continues searching the vehicle. He next searches a green bag, which the other male passenger identifies as his. After searching the green bag, Cuellar Dela Cruz opens the glove compartment, searches under the front passenger seat, and then opens the center console. Almost immediately after opening the center console, Cuellar Dela Cruz pulls out documents and calls to another officer to "give that to ***, that's her." Later, when another officer asks what was in the bag, Cuellar Dela Cruz indicates that there was a handgun inside and that "he was moving a lot when we approached the car."

¶ 16     Cuellar Dela Cruz testified that the search of the backpack was unrelated to the initial stop of the vehicle and that he did not observe any signs of a weapon that were obvious to the naked eye, nor did he observe defendant violating any laws.

¶ 17     Cuellar Dela Cruz testified that the vehicular infractions he observed constituted the factors that led to the traffic stop. He, however, further testified that he prepared an investigatory stop report in connection with the stop, in which he checked a box providing that the "reasonable articulable suspicion for the stop" was "gang or narcotic related enforcement." Cuellar Dela

Cruz admitted that, at the time he stopped the Tahoe, he did not know whether any of the vehicle's occupants were in a gang and there was no evidence of any narcotics activity. He, however, explained that he was required to check that box due to the officers' discovery of open baggies containing cannabis residue on the center console of the vehicle. When asked about the fact that the cannabis was not listed in the narrative portion of the report, in his partner's incident report, or in defendant's arrest report, Cuellar Dela Cruz pointed to the fact that defendant was not the driver of the vehicle.

¶ 18     The parties then presented arguments as to the propriety of the search, with the defense claiming that the search of the bag was not connected to the purpose of the traffic stop and that the officers unreasonably extended the length of the stop. By contrast, the State maintained that the police properly stopped the Tahoe for traffic infractions and, while doing so:

> "They observed the defendant making furtive movements to a backpack that was right next to him. You heard the testimony. There was nobody else sitting in the rear driver's seat. He was making furtive movements towards that backpack which alerted the officers that there might be something illegal in that backpack.
>
> Officers can have separate reasonable suspicion to stop an individual when they stop—when they initially have reasonable suspicion to stop based on something completely and totally different.
>
> In this case the officers saw the defendant making furtive movements towards the bag. They checked the bag. It had his identifying documents in it and his work ID in it, Judge."

¶ 19    The trial court ultimately denied defendant's motion to suppress the firearm evidence. The trial court found that the police had a right to stop the Tahoe due to multiple traffic violations. With respect to the search of the bag, the trial court found:

> "[W]hat has not been brought out in closing argument but was brought out in evidence, there was bullet holes in the car and there was no cross-examination concerning the fact that the officer testified there was bullet holes in the car.
>
> All right. Under these circumstances that changes from a traffic violation to another fact that had been stated as far as bullet holes. Bullet holes aren't common in cars. And so then coupled with the furtive moves, certainly that gave the officer articulable facts to conduct the search of the bag."

The trial court further found that there was no undue delay in conducting the traffic stop, as part of the delay in running the driver's information was the driver's own conduct. The trial court therefore denied the motion to suppress the firearm evidence.

¶ 20                                    *Trial*

¶ 21    The matter proceeded to a jury trial, which was conducted over two days in October 2022. As noted, prior to the commencement of trial, the State indicated that it would be proceeding only on the armed habitual criminal count and nol-prossed all remaining counts. The parties also stipulated that defendant had previously been convicted of two qualifying felony offenses for purposes of the armed habitual criminal statute. Accordingly, the only issue at trial was defendant's possession of a firearm.

¶ 22    The State presented the testimony of the two officers primarily involved in the traffic stop: Cuellar Dela Cruz and his partner, Virginia Dominguez. Cuellar Dela Cruz testified to the same basic facts concerning the timing and reason for the traffic stop as in his testimony during the

hearing on the motion to suppress. He then testified that, upon approaching the Tahoe, he approached the driver's side of the vehicle while Dominguez approached the passenger's side. As he approached, the driver's window was lowered. Since it was dark, Cuellar Dela Cruz used his flashlight to look into the vehicle and observed three occupants: a female driver, a male passenger, and defendant, in the back seat behind the passenger's seat. As he approached the Tahoe, he "observed [defendant] making movements towards what appeared to be, at that moment, a black bag." Cuellar Dela Cruz further testified:

"I was having a conversation with the driver. I, um, caught my eye at the back passenger trying to make movements. His body went a little bit forward. His left hand went toward the center of the console, reaching in the backseat and the center console of the vehicle. He was trying to conceal something.

At that moment, I didn't know what he was reaching for."

¶ 23       Cuellar Dela Cruz asked all of the occupants for identification, which the driver was unable to provide. He then returned to the police vehicle to run the names of the passengers through the LEADS system and asked that all of the occupants step out of the Tahoe. After Cuellar Dela Cruz returned to the Tahoe after running the names, the driver asked him to retrieve her driver's license from the center console, and Cuellar Dela Cruz did so, passing the identification to Dominguez. He then searched the vehicle and removed the bag from behind the center console, next to where defendant had been sitting; Cuellar Dela Cruz testified that the bag was "touching [defendant's] leg" when he first observed it. When he opened the bag, Cuellar Dela Cruz discovered a loaded black .40-caliber Glock firearm, as well as work identification with defendant's name and photo and multiple bills in defendant's name.

¶ 24    The video from his body-worn camera was then played for the jury. The video, which was admitted into evidence, depicts the traffic stop in its entirety. As the issues on appeal, however, revolve around the visibility of defendant at the beginning of the traffic stop, we focus on describing that portion of the video. As in the video shown during the suppression hearing, the video depicts Cuellar Dela Cruz behind the wheel of a police vehicle, where he stops a dark SUV at approximately 8:38 p.m. It is dark outside, but the area is illuminated by streetlights and lights on nearby buildings, and there is a gas station across the street from where Cuellar Dela Cruz stops. From the view as Cuellar Dela Cruz steps out of his vehicle, the back window and three sets of side windows of the Tahoe are visible; the rearmost window on the driver's side is covered with dark plastic. The windows appear dark, but the video depicts Cuellar Dela Cruz shining a flashlight at the vehicle. When Cuellar Dela Cruz approaches the vehicle, the driver lowers her window at his request, and he shines the flashlight inside the vehicle for approximately 20 seconds while engaging with her before she rolls the window partially back up. He then continues to engage with the driver through the mostly closed window for approximately 90 more seconds until Dominguez arrives to speak with her; as he moves his flashlight, the driver becomes alternately more and less visible through the tint of the window. At that point, Cuellar Dela Cruz moves to the passenger's side of the vehicle to continue the traffic stop by obtaining the identification for both male occupants, returning to the police vehicle to run the information, then conducting a search of the Tahoe's interior.

¶ 25    On cross-examination, Cuellar Dela Cruz testified that it was dark outside at the time of the traffic stop and that he relied on artificial lighting from street lamps, the police vehicle, and his flashlight. He further testified that, when he first observed the Tahoe, it was traveling in the opposite direction from the police vehicle, so he was able to view the interior of the Tahoe

11

through the front windshield; he could observe the driver and front passenger but was not able to view the backseat.

¶ 26 Cuellar Dela Cruz testified that, when he exited the police vehicle, the plastic bag blocked the view through the rearmost driver's side window of the Tahoe and the front and middle windows were both tinted such that he "couldn't see through the tints of the windows." He further testified that, upon approaching the Tahoe, the driver's window was already lowered; after being shown a portion of the video from his body-worn camera, Cuellar Dela Cruz admitted that he was "wrong" and that the driver's window was not lowered at the time he first approached the vehicle. He, however, reaffirmed that he observed defendant reaching for the bag "after the driver's window had come down."

¶ 27 Cuellar Dela Cruz was impeached by his testimony at the suppression hearing, in which he had testified that he observed defendant making "sudden movements to the floorboard of the vehicle" as the officers approached the Tahoe. Cuellar Dela Cruz, however, explained that, when they exited the police vehicle, both of the officers' flashlights were pointed toward the rear window of the Tahoe, which was not fully tinted, and "[t]hat's when we saw him *** making movements in the back." When he was speaking with the driver, "that's when [he] observed [defendant] moving his left hand towards the center console of the backseat."

¶ 28 Cuellar Dela Cruz was further cross-examined about the two reports he prepared in connection with the traffic stop and the fact that neither report indicated that defendant was reaching toward the bag; on redirect examination, however, he clarified that his police reports indicated that he observed defendant reaching downward. His report also indicated that, when asked whether the bag was his, defendant "did not answer or claim the bookbag," but the video demonstrated that defendant denied that the bag was his. Defense counsel also noted that

Cuellar Dela Cruz testified at trial that he observed defendant's work identification in the bag but testified at the suppression hearing that other than the bag, "it was just a bunch of paperwork" containing defendant's "name and information."

¶ 29    During her testimony, Dominguez testified consistently with Cuellar Dela Cruz concerning the basic aspects of the traffic stop. She testified, however, that her body-worn camera was not working properly during the stop; while she was speaking with the driver, she noticed the camera "making noises," followed by "a long period [of] noise, which means my camera turning off." The camera, however, resumed working shortly before she searched the bag recovered from the backseat of the vehicle.

¶ 30    Dominguez testified that, after they stopped the Tahoe, she used her "spotlight and then my flashlight" as she approached the passenger's side of the vehicle and observed defendant's upper body "bent towards the floorboard." Dominguez stopped when she reached the rear of the Tahoe and briefly interacted with defendant, who had rolled the window partially down; due to her height, she was unable to view the inside of the vehicle. Dominguez was not present for the search of the vehicle, as she was interacting with the driver. She was, however, the officer who ultimately searched the bag and recovered the firearm. In addition to the firearm, the bag contained mail with defendant's name on it, as well as work identification bearing defendant's name and photo.

¶ 31    The video from her body-worn camera was admitted into evidence and was published to the jury. The video depicts her leaving the police vehicle and approaching the passenger's side of the Tahoe while using a flashlight. She stops near the back seat, where defendant is seated with the window partially rolled down, and interacts with him briefly; he appears to be speaking on a cell phone. Dominguez then moves to the driver's side of the vehicle, where she

interacts with the driver before the video stops; the position of the camera is well below the window line of the Tahoe, presumably due to her height. When the camera resumes operation, Dominguez is in the front passenger's seat of the police vehicle, holding several driver's licenses. She then exits the vehicle and picks up a black backpack that is in the footwell of the passenger's seat and proceeds to search it, recovering, among other things, a firearm.

¶ 32    On cross-examination, defense counsel questioned Dominguez about her familiarity with body-worn cameras and her understanding as to her obligations to ensure their proper operation during the course of law enforcement activities. Counsel also questioned Dominguez about the fact that her arm appeared to be near her camera shortly before her camera stopped working. Dominguez also testified that, at the time she searched the bag, Cuellar Dela Cruz had already performed a preliminary search and had moved objects within the bag.

¶ 33    Defense counsel also cross-examined Dominguez as to precisely when she observed movement in the backseat. She testified that she observed movement "while I was exiting my vehicle, about to hit the sidewalk." She further testified that, while the rear passenger's side window was tinted, she "was able to see with the spotlight through the window," even though it was not apparent on the video. Dominguez testified that, when defendant rolled his window down, he was on the phone and was not doing anything suspicious. Dominguez further testified that defendant was cooperative throughout the encounter.

¶ 34    After the testimony of the two officers, the stipulation between the parties concerning defendant's prior felony offenses was entered into evidence, and the State rested. The defense made a motion for a directed verdict, which was denied. Defendant presented no evidence on his own behalf, and the parties proceeded to closing argument. While instructing the jury, the trial court informed the jury that, if it determined that an officer's body-worn camera recording

14

was intentionally not captured, "you shall consider that in weighing the evidence, unless the State provides a reasonable justification."

¶ 35    During jury deliberations, the jury sent two notes to the trial court. The first contained two questions: "Did [defendant] state the gun was his?" and "Did [defendant] state the black bag was his?" The second provided: "We currently have 11 votes one way, and one vote the opposite way. What do we do?" With respect to the first note, the trial court informed the jury that it had heard all of the evidence in the case and that it should continue to deliberate. With respect to the second note, the trial court responded: "You are an exceptional Jury. Please, continue to deliberate." The jury ultimately found defendant guilty of being an armed habitual criminal.

¶ 36    Defendant filed a motion for new trial, which was denied, and the trial court sentenced him to 73 months in the IDOC, one month greater than the minimum sentence. Defendant filed a motion to reconsider sentence, which was also denied, and this appeal follows.

¶ 37                                   ANALYSIS

¶ 38    On appeal, defendant contends that (1) the trial court should have suppressed the firearm discovered at the traffic stop at which defendant was arrested and (2) the State failed to prove him guilty beyond a reasonable doubt. We begin by considering the denial of the motion to suppress.

¶ 39    A ruling on a motion to suppress is subject to a two-part standard of review. *People v. Hagestedt*, 2025 IL 130286, ¶ 14. The trial court's factual findings are reviewed deferentially and will be reversed only if they are against the manifest weight of the evidence. *Id.* The trial court's ultimate legal ruling, however, is reviewed *de novo*. *Id.*

¶ 40        Both the federal and state constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "A search conducted without prior approval of a judge or magistrate is *per se* unreasonable under the fourth amendment, subject only to a few specific and well-defined exceptions." *People v. Bridgewater*, 235 Ill. 2d 85, 93 (2009). A vehicle stop is subject to the fourth amendment's reasonableness requirement and is analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), which permit a brief, investigatory stop of a person where a police officer reasonably believes that the person has committed, or is about to commit, a crime. *People v. Close*, 238 Ill. 2d 497, 505 (2010). In this case, there is no dispute that the initial stop of the Tahoe was permissible based upon the officers' observations of the cracked windshield, missing front license plate, and broken side window. See *People v. Hackett*, 2012 IL 111781, ¶ 28 (an officer may conduct a lawful *Terry* stop when he observes possible infractions of traffic rules).

¶ 41        Defendant also does not dispute that the officers were entitled to search the Tahoe for proof of ownership if the driver was unable to provide such proof, as the license plate did not belong to that vehicle. See *People v. Hayden*, 58 Ill. App. 2d 420, 422 (1965) (search of vehicle was permissible in order to attempt to ascertain proof of ownership where the defendants were unable to produce evidence of such ownership). Defendant, however, contends that the officers did not have the authority to extend the search of the vehicle to encompass a search of the bag in which the firearm was discovered.

¶ 42        Under the "automobile exception" to the warrant requirement, police officers may search a vehicle "if there is probable cause to believe that the automobile contains evidence of criminal activity that the officers are entitled to seize." *People v. James*, 163 Ill. 2d 302, 312 (1994). "To establish probable cause, it must be shown that the totality of the facts and

circumstances known to the officer at the time of the search would justify a reasonable person in believing that the automobile contains contraband or evidence of criminal activity." *People v. Hill*, 2020 IL 124595, ¶ 23. As officers may rely on their law-enforcement training and experience in drawing inferences that might evade untrained civilians, a reviewing court determines the existence of probable cause "through the standpoint of an objectively reasonable officer." *Id.*

¶ 43    In this case, the State raises two bases for finding probable cause to search the bag. First, the State contends that multiple factors, including the license plate not belonging to the vehicle; the driver's noncompliance; and the "multiple bullet holes, damaged windows, and suspect cannabis residue on the center console," coupled with defendant's "sudden movements to the floorboard of the vehicle while he was holding something in his hand," gave the police officers probable cause "to believe that the vehicle could contain more evidence related to the fictitious plates."[4] We do not find this argument persuasive.

¶ 44    As an initial matter, we note that the State's characterization of the traffic stop overstates several factual matters. Specifically, there was one broken window that was covered with plastic and a cracked windshield, which may be traffic violations but are hardly unusual. We also disagree with the description of the driver as "noncomplian[t]," as she made it clear from the beginning of the traffic stop that she was uncomfortable with Cuellar Dela Cruz and wished to speak with his superior or, at a minimum, a female officer. We further note that the driver

---

[4]We note that, during the suppression hearing, the State focused solely on the "furtive movements" made by defendant, which the State contended "alerted the officers that there might be something illegal in that backpack." The State, however, does not argue in its brief that the furtive movements alone were sufficient.

provided some identification documents prior to the time Cuellar Dela Cruz performed his initial search of the bag.

¶ 45      To the extent that the search was justified on the basis of searching for "evidence related to the fictitious plates," we observe that the bag—which was on the floor of the back seat of the vehicle—was searched prior to the glove compartment or the center console, both areas that would more typically contain documentation concerning the vehicle's ownership. The scope of a warrantless search of an automobile is " 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.' " *People v. Randall*, 2022 IL App (1st) 210846, ¶ 45 (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)). The fact that the officers bypassed the obvious areas to search a bag in the back seat suggests that the purpose of the search was not, in fact, to search for evidence concerning the vehicle's ownership. See *id.* (where officer immediately searched the trunk of the vehicle, her actions "tend to support the notion that the officers were on a fishing expedition as opposed to a targeted search based on probable cause"). This is highlighted by the fact that, upon beginning his search of the vehicle, Cuellar Dela Cruz commented to another officer that "I don't know what *he* has in there" (emphasis added), making it clear that he did not believe that the bag belonged to the female driver.

¶ 46      We also note that, during his testimony at the suppression hearing, Cuellar Dela Cruz specifically disclaimed this rationale for the search. On cross-examination, he identified the reasons for the initial stop as "[t]he cracked windshield, the missing front plate, the back plate coming [back] to a different car, bullet holes and a garbage bag over the back left window." He then testified:

"Q. *** Is it fair to say the search of that backpack didn't have anything to do with the traffic infraction? Right?

A. Correct.

Q. It had nothing to do with any of those five traffic infractions?

A. Yes.

Q. So it was totally unrelated to your initial stop of the vehicle?

A. Correct."[5]

¶ 47    Moreover, we are unpersuaded by the State's suggestion that defendant's "furtive movements" observed at the beginning of the traffic stop entitled Cuellar Dela Cruz to "pick up the bag and look inside of it to see if it contained evidence of contraband, which it did." As the State appears to recognize, furtive movements alone do not provide probable cause for a search in the absence of other circumstances tending to show probable cause. See *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 16; *Randall*, 2022 IL App (1st) 210846, ¶ 37. Here, as explained, there is no evidence suggesting that any alleged furtive movements bore any connection to the purported reason for the search, namely, the search for evidence connected to the vehicle's ownership. We thus cannot find that the search of the bag was justified on the basis of searching for evidence concerning the Tahoe's ownership.

¶ 48    The State additionally contends that the search was justified where the officers feared for their safety. An officer is permitted to conduct a protective search of a passenger compartment

---

[5]We note that, during oral argument, the State suggested that Cuellar Dela Cruz did not indicate by this testimony that the search of the bag was unrelated to the fictitious plates, as he testified that the search was unrelated to the initial traffic stop and "the fictitious plates [were] discovered in the course of the traffic stop" and were not the basis for the stop. As can be seen from his testimony, however, Cuellar Dela Cruz testified that "the back plate coming [back] to a different car" was one of the reasons for the initial traffic stop and that the search of the bag "had nothing to do with any of those *five* traffic infractions" (emphasis added), including the fictitious plates.

of a vehicle during an investigatory stop, as roadside encounters are especially hazardous and "a police officer may reasonably believe that he is in danger from the possible presence of accessible weapons inside the vehicle." *People v. Colyar*, 2013 IL 111835, ¶ 38 (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). Such a search should be limited to the area where a weapon may be located or hidden, and "[t]he search is permissible only when the officers possess a reasonable belief, based on specific and articulable facts and reasonable inferences from those facts, that the individual was dangerous and could gain control of a weapon." *Id.* ¶ 39.

¶ 49    In this case, however, Cuellar Dela Cruz did not testify that he feared for his safety or that he had reason to believe that the Tahoe's occupants were armed. Additionally, Cuellar Dela Cruz testified that both passengers of the Tahoe were asked to exit the vehicle during the traffic stop and that defendant was handcuffed while standing behind the vehicle during the course of the stop. He also admitted that his investigatory stop report indicated that a protective pat-down of defendant's person was conducted after he was handcuffed and that no weapons were recovered. He further testified that he did not observe any evidence of a weapon inside the vehicle, nor did he observe any evidence that either of the passengers had violated the law. There is thus no evidence supporting an inference that the individuals in the vehicle were dangerous and could gain control of a weapon so as to justify a search of the bag.

¶ 50    We further observe that there were a number of officers present at the scene of the traffic stop. Indeed, even prior to the officers' initial contact with the Tahoe's occupants, a second police vehicle had arrived to provide backup, and at one point, at least five police vehicles were present at the scene. We also find noteworthy the fact that the vehicle's occupants were not ordered to exit the Tahoe until Cuellar Dela Cruz ran the plates and told another officer that

"the plates don't match to this car, I got enough s*** to get 'em out," which occurs approximately three minutes into the traffic stop. Even then, the front passenger is permitted to remain inside the Tahoe until almost four minutes into the traffic stop, while the driver remains inside the vehicle until six minutes into the traffic stop. Presumably, if the officers had feared that any of the vehicle's occupants were dangerous and could gain control of a weapon inside the bag—or inside the vehicle—they would have immediately been ordered away from the source. Instead, Cuellar Dela Cruz's own comments make clear that the reason they were ordered to exit the Tahoe was due to the fictitious plates, not due to any perceived danger.

¶ 51      We recognize that, in certain circumstances, an officer may conduct a search of the vehicle even after an individual has been handcuffed. See, *e.g.*, *Colyar*, 2013 IL 111835, ¶¶ 47-48 (finding a search of the passenger compartment permissible even where the defendant was handcuffed). In those cases, however, the continued search is permissible where the officers' reasonable suspicion of a firearm being present is not dispelled by the circumstances. See *id.* Here, however, nothing during the course of the traffic stop suggested that the vehicle's occupants were armed. To the contrary, Cuellar Dela Cruz testified that there was no evidence of any weapons or violations of the law while he was interacting with the vehicle's occupants, and defendant's pat-down did not reveal any weapons. Thus, we cannot say that a continued search of the bag was permitted out of fear for the officers' safety.

¶ 52      We also cannot agree with the State that the condition of the vehicle, coupled with defendant's "furtive movements," placed the officers in reasonable fear for their safety. Again, Cuellar Dela Cruz never testified that he was in fear for his safety or that he believed that the vehicle's occupants were armed. At most, he testified that the condition of the vehicle "caught [his] attention," which led to the traffic stop. He also, however, expressly disclaimed that the

condition of the vehicle was related to his search of the bag, as explained above. We also note that there is no suggestion that the broken window or the bullet holes on the vehicle were new or that the vehicle had recently been engaged in criminal behavior. To be clear, it is possible that, in another case and under different circumstances, the same facts could be found to support a reasonable suspicion that the vehicle's occupants were armed—for instance, if the vehicle was driving at a high rate of speed, which could suggest that the bullet holes were recent, or if evidence of a weapon was present when the officers approached the vehicle. Under the circumstances present in this case, however, we cannot find that the vehicle's condition, even coupled with defendant's movements, supported the search of the bag. Accordingly, as the officers lacked probable cause to search the bag, the trial court should have granted defendant's motion to suppress the firearm evidence discovered within the bag.

¶ 53    As the firearm evidence represented the only evidence as to defendant's possession of a firearm, without such evidence, the State cannot prove that he possessed a firearm, and his conviction must therefore be reversed outright. *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 20; *People v. Smith*, 331 Ill. App. 3d 1049, 1056 (2002). As such, we have no need to consider defendant's arguments concerning the sufficiency of the evidence presented at trial.

¶ 54    As a final matter, we note that defendant filed a motion to clarify available exhibits, which was taken with the case, seeking to address potential ambiguity as to whether the video evidence presented to the jury contained audio. As explained above, however, our decision is based exclusively on the trial court's ruling on the motion to suppress, at which the video evidence undisputedly contained audio. Accordingly, defendant's motion is hereby denied as moot.

¶ 55                                            CONCLUSION

¶ 56        The trial court erred in denying defendant's motion to suppress the firearm evidence

recovered from a search of the bag found in the backseat of the Tahoe, as the police lacked

probable cause to search the bag. Accordingly, defendant's conviction must be reversed, as

this evidence represented the only evidence of his possession of a firearm, as required for his

conviction for being an armed habitual criminal.

¶ 57        Reversed.

*People v. Smith*, 2025 IL App (1st) 231202

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CR-1507701; the Hon. Vincent Gaughan, Judge, presiding. |
| **Attorneys for Appellant:** | DePaul University Legal Clinic, of Chicago (Editha Rosario-Moore, of counsel, and Monique Colon and Sekoya Pelayo, law students), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Whitney Bond, and Jenna McMahon, Assistant State's Attorneys, of counsel), for the People. |